384 F.3d 1205
 CHRISTOPHER S., a minor, by and through RITA S., his Guardian Ad Litem; Justin R., a minor, by and through Kathi R., his Guardian Ad Litem; Robert F., a minor, by and through Tracy F., his Guardian Ad Litem, Plaintiffs-Appellants,
v.
STANISLAUS COUNTY OFFICE OF EDUCATION; Martin G. Petersen, Superintendent of Schools and Executive Secretary to the Board, in his official capacity; Stanislaus County Board of Education; Don Viss, Alex Hedberg, Zella Gharat, James Merriam, and Richard Phillips, Members, Stanislaus County Board of Education, in their official capacities; Jim Norby, Division Administrator, Stanislaus County Office of Education, in his official capacity; Salida Union School District; Antonio Borba, Superintendent, in his official capacity; Ceres Unified School District; Walt Hanline, Superintendent, in his official capacity; Hughson Unified School District; Jim Weaver, Superintendent,
in his official capacity; Stanislaus County Special Education Local Plan Area; Patricia Dimond, Director, in her official capacity, Defendants-Appellees.
 No. 03-15178.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 12, 2004.
 Filed October 8, 2004.
 
 Joyce L. Carrillo, Esq., Varma & Clancy, Sacramento, CA, for the plaintiffs-appellants.
 Jeffrey R. Olson, Esq., Modesto, CA, for the defendants-appellees.
 Appeal from the United States District Court for the Eastern District of California; Robert E. Coyle, District Judge, Presiding. D.C. No. CV 02-5631 REC.
 Before: TASHIMA and CLIFTON, Circuit Judges, and LEIGHTON, District Judge.*
 Opinion by Judge TASHIMA; Dissent by Judge CLIFTON.
 TASHIMA, Circuit Judge:
 
 
 1
 Three autistic children (the "Students") who are part of a special education program in Stanislaus County, California, filed an action against the county and local educational authorities ("LEAs") alleging that the policy of providing a shorter school day to autistic students constitutes discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and California anti-discrimination statutes. The district court dismissed the action for failure to exhaust administrative remedies under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1485, because the Students had not sought a due process hearing from the State of California. On appeal, the Students argue that the district court erred in dismissing their action for lack of jurisdiction, because they sufficiently exhausted their administrative remedies by pursuing a complaint resolution procedure ("CRP") to completion. We agree, and reverse the district court's dismissal of the case.
 
 BACKGROUND
 
 2
 All three Students have been diagnosed with autism. Christopher S., aged 12, lives in the Salida Union School District; Justin R., aged 10, lives in the Hughson Unified School District; and Robert F., aged 10, lives in the Ceres Unified School District. All of these school districts have delegated responsibility for educating autistic students to the Stanislaus County Office of Education ("SCOE"). The Students are in an autism program at John F. Kennedy School, classroom B-6.
 
 
 3
 Rita S., Christopher S.' mother, filed a request for complaint investigation with the Procedural Safeguards Referral Service of the Special Education Division of the California Department of Education ("CDE"). In compliance with 34 C.F.R. § 300.660, California established this CRP for alleged violations of the IDEA. In her complaint, Rita S. stated that at the beginning of the 2000-01 school year, SCOE informed parents that students in the autism class would be released at 12:00 p.m. each Tuesday because of budgetary constraints. At the beginning of the 2001-02 school year, SCOE sent parents a school schedule indicating that the class for autistic students would again end at noon every Tuesday.
 
 
 4
 The CDE conducted telephone interviews with Rita S. and also with the director of the Stanislaus Special Education Local Planning Area ("Stanislaus SELPA"), a representative of SCOE, and the director of the autism program. The CDE and Stanislaus SELPA also exchanged correspondence regarding Rita S.'s complaint. In its report on the compliance investigation, the CDE stated the positions of the parties as follows:
 
 
 5
 1. The Complainant alleges that the District failed to implement the 2000/2001 [Individualized Education Program] with regard to providing the same number of minutes in the instructional day to her son as to the student's chronological peer group in the regular education program.
 
 
 6
 2. The District states that they have provided an additional number of minutes per year for the students in the autism class compared to the students in general education in the same chronological peer group.
 
 
 7
 The report found that SCOE had included extended school year days in its calculations of instructional minutes for autistic students, and that "[t]he evidence presented supports a finding that students enrolled in the autism class receive less total minutes in their instructional day than their nondisabled peers in regular education programs."
 
 
 8
 The CDE report concluded that the school district was out of compliance with the requirement of California Code of Regulations, title 5, § 3001(q), that for special education students," `[i]nstructional day' shall be the same period of time as [the] regular school day for that chronological peer group unless otherwise specified in the individualized education program." The CDE gave the district 60 days to provide evidence that students in the autism class were receiving the same amount of instructional time per day as their regular education peers, "unless their IEP indicates otherwise."[1]
 
 
 9
 In response to the CDE report, SCOE increased the length of the school day for autistic students by 30 minutes. According to Patricia Dimond, director of Stanislaus SELPA, this resulted in the autistic students receiving more instructional time than their regular education counterparts. Dimond was including lunch and recess as instructional time for the autism class, however, "because of the intensive instruction provided to these students during lunch and recess." She stated that she had discussed the inclusion of lunch and recess time with the CDE investigator, who, after checking with her supervisor, confirmed that the inclusion was appropriate.[2] The CDE found that the district had completed corrective action and was in compliance. The CDE has taken no further action.
 
 
 10
 Christopher S. is the only Student whose parents filed an administrative complaint under the CRP, and none of the Students' parents has ever sought a due process hearing to challenge SCOE's failure to provide a Free Appropriate Public Education ("FAPE").
 
 
 11
 The Students filed this action against SCOE, the individual school districts, and various school administrators. In their complaint, the Students stated claims under section 504 of the Rehabilitation Act of 1973, the ADA, 42 U.S.C. § 1983, and California education and anti-discrimination statutes. The Students sought injunctive and declaratory relief as well as compensatory and statutory damages.
 
 
 12
 After filing this action, the Students received a notice of the 2002-03 school hours from SCOE. The school day for the autism class was again shorter than for regular education students in the Students' home districts. The instructional day was also shorter, unless one counted the autistic students' lunch and recess periods. Tuesdays remained minimum days.
 
 
 13
 The Students filed a motion for a preliminary injunction to stop the LEAs from providing fewer instructional minutes per day to autistic students and from providing a minimum day on Tuesdays. In their opposition to the preliminary injunction motion, the LEAs argued that the Students had failed to exhaust their administrative remedies under the IDEA, specifically the due process hearing procedures set forth in 20 U.S.C. § 1415(f). Although the Students did not bring an IDEA claim, exhaustion of IDEA administrative remedies is a prerequisite to filing any federal claim for relief that is also available under the IDEA. 20 U.S.C. § 1415(l).
 
 
 14
 The district court denied the Students' motion for a preliminary injunction and dismissed the case for lack of jurisdiction. The Students had argued that this was not a case involving substantive educational decisions; rather, the court needed only to decide the simple factual question of whether the Students were receiving fewer instructional minutes per day than their nondisabled peers and, if so, whether this violated the law. The district court concluded, however, that "it is not unlawful to include lunch and recess minutes for special education instruction if the IEP contains goals and objectives regarding those skills and if appropriate instruction is provided during that time." For this reason, the district court saw "no difference between plaintiffs' complaints that their IEPs do not allow for instruction during lunch and recess and any other challenge to the allegedly improper implementation of an IEP, notwithstanding plaintiffs' claim of discrimination." In short, the district court concluded that the Students' claims turn on a factual inquiry best addressed in a due process hearing.
 
 JURISDICTION
 
 15
 Concluding that the Students had failed to exhaust their administrative remedies under the IDEA, the district court dismissed the case for lack of jurisdiction. If the Students did exhaust their administrative remedies, the district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1367(a). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.
 
 STANDARD OF REVIEW
 
 16
 Whether a plaintiff has met the IDEA's exhaustion requirements is predominantly a question of law that we review de novo. Porter v. Bd. of Trustees, 307 F.3d 1064, 1069(9th Cir.2002), cert. denied, 537 U.S. 1194, 123 S.Ct. 1303, 154 L.Ed.2d 1029 (2003).
 
 ANALYSIS
 
 17
 We must decide whether the district court erred in dismissing the Students' lawsuit for lack of jurisdiction. In particular, we must decide whether the Students were required to seek a due process hearing under the IDEA or whether, under the facts of this case, exhaustion of the CRP was an adequate substitute.
 
 
 18
 The requirement that aggrieved parties exhaust their administrative remedies before filing a lawsuit reflects the principle that where Congress has delegated decision-making to an executive agency, that agency (rather than the courts) should have primary responsibility for administering the program in question. Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1303 (9th Cir.1992). In the context of the IDEA, the requirement also reflects "the traditionally strong state and local interest in education." Id. In sum, exhaustion "allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children." Id.
 
 
 19
 Under the IDEA, the federal government provides financial assistance to state and local educational agencies to help educate disabled students. The federal money is conditioned, however, on the agencies' implementation of the IDEA's substantive and procedural requirements. Robb v. Bethel Sch. Dist. # 403, 308 F.3d 1047, 1048-49 (9th Cir.2002). The Act's main purpose is "`to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs ... [and] to ensure that the rights of children with disabilities and parents of such children are protected.'" Id. at 1049 (quoting 20 U.S.C. § 1400(d)(alterations in Robb)).
 
 
 20
 To help reach these goals, the IDEA requires that states enact procedural safeguards to guarantee parental involvement in decisions relating to the child's education and to ensure local compliance with the IDEA. Hoeft, 967 F.2d at 1300; see also 20 U.S.C. § 1415(a).
 
 
 21
 To ensure parental involvement in educational decisions, the IDEA requires states to guarantee that parents of disabled students have the right to bring complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." Id. § 1415(b)(6). Any parent who brings such a complaint must have an opportunity for an impartial due process hearing conducted by the state or local educational agency. Id. § 1415(f). If the hearing is held by a state agency, as is the case in California, see Cal. Educ.Code § 56501(b)(4), any party dissatisfied with the result may file a civil action. 20 U.S.C. § 1415(i)(2)(A).
 
 
 22
 In addition to, and distinct from, the IDEA's due process requirements for ensuring parental involvement in FAPE educational decisions, regulations promulgated by the United States Department of Education "provide an administrative mechanism for ensuring state and local compliance with federally funded education programs, including the IDEA." Hoeft, 967 F.2d at 1300. These regulations, originally part of the Education Division General Administrative Regulations ("EDGAR"), require states to adopt a CRP for claims that a state or local agency is violating the IDEA. See 34 C.F.R. §§ 300.660, 300.662.
 
 
 23
 The Students argue that they were not challenging their individual identification, evaluation, educational placement, or provision of a FAPE. For this reason, their parents did not need to seek a due process hearing under California Education Code § 56501. Rather, they were challenging the legality of SCOE's policy of providing less instructional time to all autistic students. Thus, the Students argue, they exhausted the correct administrative remedy by pursuing the CRP to completion pursuant to California Code of Regulations, title 5, §§ 4600-4671. See id. § 4610("This Chapter applies to the filing, investigation and resolution of a complaint regarding an alleged violation by a local agency of federal or state law or regulations governing educational programs, including allegations of unlawful discrimination....").
 
 
 24
 The LEAs, on the other hand, argue that the Students are in essence arguing that they were denied a FAPE — what the Students contend is a legal question (i.e., whether it was unlawful discrimination for SCOE to provide them with fewer instructional minutes than their nondisabled peers) is really a factual question. That is, whether the Students received fewer instructional minutes turns on whether lunch and recess may be considered "instructional." This in turn depends on whether the Students' IEPs contain goals designed to develop functional skills that are taught to them during lunch and recess. The real issue, therefore, according to the LEAs, is whether the Students' IEPs have been properly implemented, a claim for which one should request a due process hearing before filing a civil action.
 
 
 25
 In Hoeft, as here, the plaintiffs filed an EDGAR complaint but did not seek a due process hearing under the IDEA. 967 F.2d at 1302. As here, they argued that the due process procedures were inapplicable, because plaintiffs were challenging an across-the-board policy. Id. at 1304. In Hoeft, we explained that when determining the validity of a policy is purely a matter of law, there is less reason to require IDEA exhaustion because "agency expertise and an administrative record are theoretically unnecessary in resolving the issue at hand." Id. at 1305; see also Christopher W. v. Portsmouth Sch. Comm., 877 F.2d 1089, 1095 (1st Cir.1989) (noting that the purposes of the exhaustion doctrine are not furthered when the issue is a matter of law).
 
 
 26
 Nevertheless, we noted in Hoeft that another purpose of exhaustion was still relevant, namely, giving the state an opportunity to fix the allegedly unlawful policy. 967 F.2d at 1307. Because filing a complaint with the state fulfills such a function,
 
 
 27
 [t]he EDGAR complaint procedure may furnish an appropriate administrative remedy where the only purposes served by exhaustion are to notify the state of local noncompliance and to afford it an opportunity to correct the problem. Whether to require or to accept exhaustion of the EDGAR procedure as a substitute for exhausting IDEA procedures in challenges to facially invalid policies, however, is a determination which must be made on a case-by-case basis.
 
 
 28
 Id. at 1308; see also Porter, 307 F.3d at 1074(noting that "we agree with the statement in Hoeft that there may be instances when exhaustion of the CRP may be a substitute for exhaustion of the due process hearing.") (emphasis in original); cf. Lucht v. Molalla River Sch. Dist., 225 F.3d 1023, 1028-29 (9th Cir.2000) (holding that "[t]he CRP and the due process hearing procedure are simply alternative (or even serial) means of addressing a § 1415(b)(6) complaint" and "[a]lthough different, a CRP is no less a proceeding under § 1415 than is a due process hearing"). Although the plaintiffs in Hoeft had arguably alleged a facial violation of the IDEA, they did not wait for a decision on their EDGAR complaint before filing suit. They had therefore failed to exhaust any of their administrative remedies. Hoeft, 967 F.2d at 1308.
 
 
 29
 Here, we conclude that the pursuit of the IDEA due process remedies under the facts of this case will not "further the general purposes of exhaustion and the congressional intent behind the administrative scheme." Id. at 1303. SCOE's decisions to have a shorter school day for autistic students and to have a minimum day each Tuesday were blanket policies that had nothing to do with the content of individual IEPs — no individualized decisions were made on a case-by-case basis. As the LEAs admit, the school schedule was an across-the-board administrative decision by SCOE, not a decision that resulted from any individual Student's IEP process. Similarly, rather than making an individualized determination that any particular student could not tolerate a complete day on Tuesdays, SCOE simply set a school schedule that applied equally to all autistic students. The stated reasons for the shortened Tuesdays were administrative convenience, namely the proper training and retention of classroom aides.[3]
 
 
 30
 The United States Department of Education, Office of Civil Rights ("OCR"), has repeatedly held that a blanket policy of shortened school days for disabled students violates section 504 the Rehabilitation Act and the ADA. See, e.g., Treutlen County (GA) Sch., 33 Individuals with Disabilities Educ. L. Rep. (LRP) 1068, 1069 (July 11, 2000); La Canada (CA) Unified Sch. Dist., 20 Individuals with Disabilities Educ. L. Rep. (LRP) 630, 631-32 (July 9, 1993); Hartford County (MD) Pub. Sch., 18 Individuals with Disabilities Educ. L. Rep. (LRP) 1114, 1115 (Jan. 16, 1992). The OCR did not perform an IDEA analysis in any of these proceedings because, as here, the practice of providing shortened school days for disabled students constituted an administrative policy separate from the IEP process.[4]
 
 
 31
 The LEAs argue, however, that the school days for autistic students are not actually shorter, because lunch and recess may qualify as instructional time for individual students, if their IEPs contain goals related to skills learned during lunch and recess. This argument is unavailing, however, as there is no evidence that the decision to count lunch and recess as instructional time arose out of the IEP process.[5] As was the case in Tustin (CA) Unified School District, 23 Individuals Disabilities Educ. L. Rep. 109(LRP) (May 23, 1995), SCOE categorically shortened the school day for all autistic students rather than on the basis of a determination of any individual student's needs. See id. at 110-11.
 
 
 32
 In addition, in an administrative complaint proceeding with facts strikingly similar to this case, the OCR held that lunch and recess may not be counted as instructional time where the individual IEPs do not reflect specific goals and objectives to be worked on during lunch and recess:
 
 
 33
 [The LEA] further stated that short breaks and lunch are considered instructional time and that student IEPs reflect this. However, our examination of the applicable portions of six (of 19) IEPs for students at the Center disclosed that the IEPs failed to reflect specific goals and objectives regarding behavior or other activities to be worked on during lunch or breaks.
 
 
 34
 Regarding the early dismissal on Tuesdays, [the LEA] informed OCR that there is nothing in any of the IEPs that states that any of the students at the Center should have a shortened school day. Students are dismissed early each Tuesday as the clinic and education staff meet every Tuesday to discuss commonly served students....
 
 
 35
 On Tuesdays, all students at the Center are dismissed at noon, and therefore, have a school day of only three hours, which is significantly less than that provided to nonhandicapped students. The evidence failed to show that a shortened school day on Tuesday is necessary for any of the students at the Center due to their educational, medical or emotional needs, but rather is based on the administrative convenience of Recipient officials. Thus, the Recipients are failing to provide a school day to students placed at the Center which is substantially equal to that provided to nonhandicapped students, without justification based on the individual needs of the handicapped students, and are failing to provide an education which meets the individual needs of handicapped persons as adequately as the needs of nonhandicapped persons are met, in violation of Section 504 and its implementing regulation at 34 C.F.R. Secs. 104.4(b)(1) and 104.33(b).
 
 
 36
 Greater Lafayette Area (IN) Special Services, 352 Educ. Handicapped L. Rep. (CRR) 601, 602 (June 14, 1988).[6] The IEPs included in the record do not state that instruction will take place during lunch or recess or that minimum days are necessary because of any individual student's needs.
 
 
 37
 By pursuing the CRP to completion, Rita S. put the State of California on notice of the facially unlawful policy of providing a shortened school day for all autistic students. Moreover, in a fax to the state dated November 8, 2001, SCOE made clear that it was counting lunch and recess as instructional minutes. Nevertheless, the CDE informed Rita S. that it would take no further action against the county. In these narrow circumstances, we conclude that requiring each autistic student to seek a due process hearing would not further the purposes of exhaustion or the Congressional intent behind the IDEA scheme. Cf. Beth V. by Yvonne V. v. Carroll, 87 F.3d 80, 88 (3d Cir.1996) (holding that a plaintiff enjoys an express right of action under the IDEA for a state's failure to comply with the CRP).
 
 
 38
 In sum, we hold that the Students sufficiently exhausted their administrative remedies because they are challenging a blanket decision to shorten the school day for autistic students, one made outside of the IEP process; because Rita S.'s administrative complaint put the state on notice of the issue; and because determining whether lunch and recess may be counted as instructional time in this case does not require administrative expertise.
 
 CONCLUSION
 
 39
 We reverse and remand to the district court for further proceedings consistent with this opinion.
 
 
 40
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 *
 The Honorable Ronald B. Leighton, United States District Judge for the Western District of Washington, sitting by designation
 
 
 [1]
 An Individualized Education Program, or "IEP," is a written plan that must be developed for each disabled student by an "IEP team" consisting of the child's parents, the special education teacher, a representative of the LEA, and an expert who can interpret test results. The IEP sets forth the child's current level of performance, annual goals, and the methods for achieving those goalsSee 20 U.S.C. § 1414(d).
 
 
 [2]
 At her deposition, the investigator had no recollection of such a conversation. In a fax that SCOE sent to the CDE before it issued its final report, however, SCOE indicated that lunch and recess minutes were being counted
 
 
 [3]
 The dissent disagrees with our reliance on the undisputed fact that the shorter school day for autistic students "was a blanket, across-the-board administrative decision by county educational officials, not a decision that `resulted from any individualized Student's IEP [ ] process.'" Dissent, at 1215. It then asserts that "[t]here is no requirement that all school policies relating to autistic children arise out of the IEP process, and there should not be."Id. This latter assertion is again repeated by the dissent, viz., "[t]here simply is no requirement that all school policies relating to autistic children arise out of individual students IEPs, or anything in the law which forbids a school from making broad-based decisions. The majority opinion provides neither reasoning nor citation to any authority to support the proposition that there is." Id. at 1215. First, we nowhere assert that "all school policies" relating to autistic children must arise out of an IEP. There is, however, a regulatory requirement that the "instructional day" for special education students "shall be the same period of time as [the] regular school day for that chronological peer group unless otherwise specified in the [IEP]." Cal.Code Regs. tit. 5, § 3001(q) (emphasis added). The LEAs do not dispute that there is such a requirement. Their contention is that the requirement can be met by counting the lunch hour as part of the "instructional day." But as we make clear in the text, because the "instructional day" for the Students' chronological peer group does not include the lunch hour, § 3001(q) requires that the decision be made in the context of the Students' IEPs.
 
 
 [4]
 In an analogous context, we held that "a reduction in hours is valid in principle if it is contemplated by the child's [Individual Family Service Plan] and linked to his or her developmental goals."Adams v. Oregon, 195 F.3d 1141, 1150 (9th Cir.1999). We noted, however, that the reduction must be linked to the child's unique needs. Id. In addition, with regard to individual students, "[b]efore the school may effect a reduction in schedule or any other change in placement contemplated by the IEP, it must notify the child's parents of their right to review, and otherwise afford them the safeguards to which they are entitled." Doe v. Maher, 793 F.2d 1470, 1491 (9th Cir.1986), aff'd as modified sub nom. Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).
 
 
 [5]
 While we agree with the dissent's observation that "it could be appropriate to count instructional efforts during lunch and recess," dissent at 1218, "if the IEP contains goals and objectives regarding those skills," id. at 1218, we disagree with its position that "this case presents a factual inquiry — whether the substantive goals and objectives of the Students' IEPs permit the counting of lunch and recess as instructional time." Id. (emphases in the dissent). That is not the basis of the blanket decision made in this case — the across-the-board decision was made without examining any IEP — and we decline to decide the exhaustion issue on the basis of a hypothetical decision not made by SCOE. Cf. SEC v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (holding that an administrative agency decision cannot be affirmed on a basis the agency did not explicitly consider); Fisher v. INS, 79 F.3d 955, 963 (9th Cir.1996) (en banc).
 
 
 [6]
 The dissent's discussion of this case, that OCR examined the IEPs of the complaining students, dissent, at 1217, only serves to emphasize the purpose for which we cite the case — that the instructional-day issue must be decided on an individualized, case-by-case basis, not as a blanket across-the-board matter, as was done here
 
 
 CLIFTON, Circuit Judge, dissenting:
 
 41
 Congress has established that providing equal educational access for children with disabilities is an important national policy and has enacted important federal statutes to further the achievement of that goal, notably the Individuals with Disabilities Education Act ("IDEA"). See 20 U.S.C. §§ 1400-1485. In its wisdom, however, Congress has left primary responsibility in this area with state and local educational authorities, especially for resolving disputes. Only after exhausting the remedial processes available within the state and local agencies may individuals seeking relief under the IDEA have access to the federal courts. Id. § 1415. The exhaustion requirement gives education professionals with expertise a reasonable opportunity to investigate and correct discriminatory policies or practices before the matter is taken up by federal courts.
 
 
 42
 That is not an accident. "The exhaustion doctrine embodies the notion that `agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer.'" Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1303 (9th Cir.1992) (quoting McCarthy v. Madigan, 503 U.S. 140, 145, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992)). "Exhaustion of the administrative process allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children." Id. (emphasis added). As the Supreme Court has observed, "courts lack the `specialized knowledge and experience' necessary to resolve `persistent and difficult questions of educational policy,'" and Congress shared that view when it adopted the IDEA. Board of Educ. v. Rowley, 458 U.S. 176, 208, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (quoting San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)).
 
 
 43
 The majority holds that the district court erred in dismissing the Students' action for failure to exhaust their administrative remedies. Though none of the Students have exercised their right to a due process hearing, specifically provided for in 20 U.S.C. § 1415(f) and Cal. Educ.Code § 56501(a), it is enough for the majority that one (but only one) of the Students pursued a state complaint resolution procedure ("CRP") to completion. The pivotal assumption underlying the majority's reasoning is that the agency expertise which could be obtained and applied in a due process hearing would not be useful and is not needed to resolve this challenge. That assumption and the majority's analysis is faulty for three reasons.
 
 
 44
 First, the majority asserts that the school policy at issue is invalid because the school schedule decision was a blanket, across-the-board administrative decision by county education officials, not a decision that "resulted from any individual Student's IEP [Individualized Education Program] process." Ante at 1211. Indeed, the "across-the-board" nature of the decision turns out to be the engine which drives the majority decision. It is the reason relied upon by the majority to disregard the fact that it might be appropriate to count lunch and recess as instructional time and thus to decide that there is no need for the factual inquiry identified by the district court and discussed below. That a decision may be made across-the-board does not necessarily mean that it is unlawful, however. That is the nature of a "policy." There is no requirement that all school policies relating to autistic children must be made on an individual basis, student-by-student, or must arise out of the IEP process, and there should not be.
 
 
 45
 Second, the majority incorrectly concludes that the school policy counting lunch and recess hours as instructional time is facially invalid. To the contrary, the validity of the school policy rests on a factual inquiry: whether the substantive goals and objectives of the Students' IEPs permit the counting of lunch and recess as instructional time. Agency expertise and a developed administrative record would be useful in resolving that question.
 
 
 46
 Third, by dismissing this action for failure to exhaust administrative remedies, the district court elected not to exercise discretion given to it under our case law. In holding that the district court was wrong in declining to exempt these plaintiffs from the administrative exhaustion requirement, we limit the district court's ability to decide when the administrative system, with its greater expertise, would be more adept at addressing the problem than the federal courts.
 
 
 47
 I agree with the district court that this challenge should not be substantively litigated in federal court before it has been addressed via the appropriate administrative process by an agency with greater expertise. I am thus unable to join my colleagues in the majority opinion and respectfully dissent.
 
 
 1. The "across-the-board" decision
 
 
 48
 The majority opinion states that the school policy at issue is invalid because "the school schedule was an across-the-board administrative decision by [the county], not a decision that resulted from any individual Student's IEP process," or one that "arose out of the IEP process." Ante at 1211, 1212. Further, the majority says the factual inquiry discussed in more detail below — whether counting lunch and recess as instructional time is consistent with the Students' IEPs — does not need to be made because the school policy was a "blanket decision," or an "across-the-board decision [which] was made without examining any IEP." Ante at 1212, n. 5.
 
 
 49
 There simply is no requirement that all school policies relating to autistic children must arise out of individual students' IEPs, or anything in the law which forbids a school from making broad-based decisions. The majority opinion provides neither reasoning nor citation to any authority to support the proposition that there is. Indeed, it is obvious that most school policies of widespread application — such as what days and hours school programs will be offered — do not arise from IEPs. I venture that not a single IEP says what time the school day should ordinarily end — 2:15, 3:00, 3:30, or whatever — but plainly every school sets a time, including a time that applies to students with disabilities. It does not violate federal law if that time does not "result from" or "arise out of" individual students' IEPs.
 
 
 50
 The majority argues nonetheless that the "across-the-board" policy in this case is forbidden, even if it is not forbidden generally, because of a California state regulation which provides that "the `instructional day' for special education students `shall be the same period of time as [the] regular school day for that chronological peer group unless otherwise specified in the [IEP].'" Ante at 1211-12, n. 3 (emphasis and alterations in original). The majority appears to misunderstand either the defendants' position, the regulation, or both. Defendants do not claim that they are permitted to provide autistic children with less instructional time because of something specified in the IEPs of those students. Instead, they contend that, after increasing the instructional time provided to autistic students by thirty minutes per day, in response to the CRP report by the California Department of Education ("CDE"), the amount of instructional time provided to the special education students is equal to or greater than the period of time provided to their peers in regular classes. If that is correct, the "unless" clause of the regulation, which references the IEPs, does not come into play. There is simply nothing in that regulation which requires that this or any other policy arise only out of the IEP process or which precludes the development of an "across-the-board" policy. The CDE — the agency primarily responsible for issuing and for enforcing the regulation in question — apparently concluded that the county was in compliance with the regulation. Ante at 1208.[1] Thus, it is unclear why the majority concludes, contrary to the CDE, that this regulation "requires that the decision be made in the context of the Students' IEPs." Ante at 1211-12, n. 3. It does not.[2]
 
 
 51
 Plaintiffs' complaint is that the county's scheduling decision discriminates against autistic children because it provides them with less instructional time than is provided to other students. Our focus should properly be on whether that allegation is factually correct — i.e., the factual inquiry discussed below. How the policy was developed may be evidence relevant to the issue, but that is not itself the legal basis for the Students' complaint.
 
 
 52
 The majority relies principally on decisions from the Office of Civil Rights ("OCR") of the Department of Education which held that certain policies of shortened school days for disabled students violated section 504 of the Rehabilitation Act and the Americans with Disabilities Act. See ante at 1212-13. The OCR line of cases does not, however, support the proposition that the scheduling policy at issue is invalid as a "blanket" policy or that review of individual students' IEPs is unnecessary to resolve the complaint. Rather, these cases support the district court's conclusion that a developed administrative record and educational expertise are useful in determining the policy's legality.
 
 
 53
 The OCR did not rule in these cases that the school policies at issue were facially illegal. Rather, the agency made particularized, factually intensive inquiries that relied upon developed administrative records. For example, in Greater Lafayette Area (IN) Special Services, 352 Educ. Handicapped L. Rep. (CRR) 601 (June 14, 1988), the OCR was explicit that its "examination of the applicable portions of six (of 19) IEPs for students at the Center disclosed that the IEPs failed to reflect specific goals and objectives regarding behavior or other activities to be worked on during lunch or breaks." 352 E.H.L.R. at 602.
 
 
 54
 Defendants in this case respond to the claim of discrimination by contending that they do not in fact discriminate, because as much instructional time is provided to autistic children as to other children. As correctly described by the district court, the key factual issue pertaining to that defense is whether the application of the scheduling policy is actually consistent with individual students' IEPs. If it is not — if instructional activity during lunch and recess is not appropriate under the students' IEPs — then the defense fails. That requires an examination of the IEPs, which is what the OCR did in Greater Lafayette Area. The majority is wrong in presuming that the individual IEPs do not matter in determining whether there has been a violation here.
 
 
 55
 We held in Hoeft that "[s]tructuring a complaint as a challenge to policies, rather than as a challenge to an individualized education program formulated pursuant to these policies ... does not suffice to establish entitlement to a waiver of the IDEA's exhaustion requirement." Id. at 1304(emphasis added). We specifically rejected the "contention that whenever the challenge involves policies applied to all[disabled] students, exhaustion is excused," and for good reason. Id. School districts require a degree of flexibility in devising general policies. The majority's approach effectively requires school districts establishing policies of general applicability, such as those regarding basic resource allocations, to tailor them to the needs of every disabled child, despite the fact that such policies are mostly dictated by outside forces. While school policies must reflect and be consistent with the goals and objectives of disabled students' IEPs, until now we have never required school districts to formulate general policies for disabled children through a bottom-up "IEP process" in which all students' IEPs dictate the exact contours of the resulting policy.
 
 
 56
 The majority's approach could cripple the ability of school districts to create generally applicable policies. The reasoning underlying the opinion implies that where one student's IEP may be potentially in conflict with a general school policy, the policy decision must be rescinded, even though it could be compatible with the IEPs of all other affected disabled students. The fact that the policy fits most students — in this case, for instance, the possibility that providing instruction during lunch and recess hours may be appropriate for most autistic children — does not mean that the students who do not fit that policy do not have basis to complain. They do, but that is a complaint best taken up through review of the individual students' needs, via a due process hearing. If a student is being shortchanged, the due process hearing will so determine and will address the deficiency. In the meantime, there should be nothing improper or unlawful about application of the policy to students for whom it fits.
 
 
 2. Facial invalidity of the policy
 
 
 57
 Our decision in Hoeft made clear that the requirement that administrative remedies must be exhausted should be excused solely in the rare circumstances where "only questions of law are involved in determining the validity of a policy, as when the policy facially violates the IDEA.... In such cases, agency expertise and an administrative record are theoretically unnecessary in resolving the issue at hand." Hoeft, 967 F.2d at 1305 (emphasis added).
 
 
 58
 This is not such a case. As the district court made clear, this case presents a factual inquiry — whether the substantive goals and objectives of the Students' IEPs permit the counting of lunch and recess as instructional time. Further, that is an inquiry which may have a different answer for different students — it may be appropriate to count instructional activities during lunch and recess as instructional time for some students but not for others. Resolution of that inquiry would be aided by both a developed administrative record and educational expertise. The district court here not only lacked educational expertise, but did not even have before it a complete administrative record containing the IEPs of all the Students.
 
 
 59
 The district court stated that "it is not unlawful to include lunch and recess minutes for special education instruction if the IEP contains goals and objectives regarding those skills and if appropriate instruction is provided during that time." The majority opinion does not dispute that legal conclusion. Nor does the majority contest the observation by the district court that it had "no information about the IEP of Robert F and knows nothing at all about the IEPs of the other children in Classroom B6 or any other classrooms attended by autistic children." (Emphasis added). Finding the record inadequate to make the requisite factual determination, the district court concluded that the "plaintiffs' complaint is one that should be handled by an impartial due process hearing," and that the question of whether "the law allows inclusion of lunch and recess minutes depend[s] on the IEP..., [and is] a factual inquiry that ... should be addressed in the first instance in the due process hearing provisions of the IDEA."[3] The district court was right.
 
 
 60
 In characterizing the school policy as a "decision [which] was made without examining any IEP," ante at 1212, n. 5, for example, the majority does not comment on the possibility that school officials might already have had an independent understanding of whether it would be appropriate to count instruction provided during lunch and recess periods, under the IEPs of affected students, so that they did not need to examine the IEPs. The majority does not even rule out the possibility that counting lunch and recess as instructional time might be consistent with the IEPs of every single student affected by the policy. Since the IEPs are not in the record, we do not know. Those facts are important. The lack of a developed record is a legitimate and appropriate reason for the district court to decide that exhaustion of administrative remedies should be required here.
 
 
 61
 The majority's conclusion may be prompted, at least in part, by skepticism concerning the substantive merit of the defendants' position. The notion that "lunch" and "recess" should count as instructional time may seem dubious on its face to persons not familiar with the needs of autistic children. It certainly struck me that way, at first. The circumstances here make it easy to infer that the rationale being offered for the county's policy lacks merit and was simply an after-the-fact rationalization. Thus, the question posed by this case may seem to be a simple one, for which administrative exhaustion should not be required, since a developed administrative record and the application of expertise are not necessary to answer the question.
 
 
 62
 On closer examination, though, the record here offers support for the defendants' position. Notably, the CDE, in the complaint resolution process, sustained the position that it could be appropriate to count instructional efforts during lunch and recess. The district court had before it a declaration which stated, in the court's words, "that the IEPs of the three plaintiffs in this action contain goals and objectives designed to develop specific functional skills that are taught to these students during each lunch and recess period of the school day." The question posed by this case turns out not to be so simple, after all.
 
 
 63
 In reversing the district court's imposition of the exhaustion requirement, the majority disregards our observation in Hoeft that "[f]ederal courts — generalists with no experience in the educational needs of handicapped students — are given the benefit of expert factfinding by a state agency devoted to this very purpose." 967 F.2d at 1303 (emphasis added). Like the district court, we lack a developed administrative record and the requisite expertise to determine whether the substantive goals and objectives of the Students' IEPs permit the counting of lunch and recess as instructional time. The exhaustion requirement is intended to help us overcome those limitations. It should not be dispensed with here.
 
 
 64
 
 3. The district court's exercise of discretion
 
 
 
 65
 Our prior cases have given district courts discretion to decide when the exhaustion requirement may be dispensed with as unnecessary in a given case, or when the state system — with its greater level of expertise — would be more adept at addressing the problem than the federal courts. We have stated that "on a case by case basis, district courts may choose to require or to accept exhaustion of the CRP as a substitute for exhausting IDEA procedures in challenges to facially invalid policies." Porter v. Board of Trustees, 307 F.3d 1064, 1073 (9th Cir.2002) (internal quotation marks omitted) (first emphasis added); see also id. at 1074 (stating that "the filing of a CRP complaint may be sufficient to meet the exhaustion requirement" and that "the CRP may serve as a substitute for due process system exhaustion") (emphases added).
 
 
 66
 In other words, we have only held that under certain, unique circumstances, district courts possess the discretion to deviate from IDEA's statutory directive requiring administrative, due process system exhaustion. We have never held that completion of the CRP may serve as an automatic exemption from the exhaustion requirement, nor have we ever reversed a district court for adhering to IDEA's requirement of administrative exhaustion.
 
 
 67
 That is, however, what the majority's decision does here. It does that in the face of a clear conclusion by the district court, after reviewing the issues and record, that the decisionmaking process in this particular case would be better served by requiring initial review of individual Student's claims in due process hearings within the state's administrative process. In holding that the district court must exempt these plaintiffs from the administrative exhaustion requirement, we limit the district court's discretion to decide when the administrative adjudication system — with its greater level of expertise — would be more adept at addressing the problem than the federal courts. That is something we have not done in our previous decisions, and which we should not do here.
 
 
 4. Conclusion
 
 
 68
 Requiring plaintiffs to exhaust the administrative remedies does not mean that their claims will be unfairly or improperly denied. Court review is still available to them if the administrative adjudicative process fails. But there is no reason to assume that the administrative process will fail. If, in fact, the school scheduling decision here cannot be reconciled with the Students' IEPs, that will likely be the result reached in a due process hearing. Neither the Students nor the majority have given any reason to believe otherwise.
 
 
 69
 Moreover, a substantive resolution to the complaint would likely have been reached far more quickly if the Students had exhausted the administrative process when they could have and should have, rather than battled to avoid that process. I cannot help but note that this lawsuit concerns a schedule announced at the beginning of the 2000-01 school year, more than four years ago. By inviting appeal of district court determinations that plaintiffs should be required to exhaust administrative remedies before proceeding in court, our decision here will likely encourage more court activity rather than less. That is not what Congress intended.
 
 
 70
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 The regulation does not require that the instructional time be at exactly the same time of day. The reference by the majority to the fact that the autistic students receive instruction during lunch and recess, while their peers do not, is irrelevant. That does not constitute a violation, at least apparently not according to the CDE. The regulation speaks to the "period" or quantity of time, not to what hour of the day or what activity may be involved
 
 
 [2]
 To be clear, whether defendants' justification is true depends upon the factual inquiry discussed below — whether it is appropriate to count instruction provided during lunch or recess periods as instructional time for these students. A proper answer to that question may properly involve a review of the needs of the students and the types of instruction that are appropriate, as expressed in the IEPs. It is not my position that the IEPs are not relevant. It is my position that schools should not be limited to policies which may emerge from the IEP process itself. A school should be permitted to establish policies applicable to all students, or to all disabled students, without necessarily violating the law simply because that policy was developed and applied on an across-the-board basis. If students with disabilities are shortchanged as a result, they have remedies, but a violation should not be assumed — or requirements of exhaustion disregarded — simply because an across-the-board policy is announced
 
 
 [3]
 Nor did the CDE have before it a complete administrative record in the complaint resolution process. The only IEP it had belonged to Christopher S. It did not have the IEPs for any of the other plaintiffs to this action or any of the other autistic students affected by the policy which is challenged here. The CDE concluded, after the county lengthened the school day for autistic children, that the school's policy didnot violate state and federal law.