**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JG; NG; RG; SG,
*Plaintiffs-Appellants,*

v.

DOUGLAS COUNTY SCHOOL DISTRICT,
*Defendant-Appellee.*

No. 06-17380

D.C. No.
CV-04-00541-LRH/
RAM

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
September 12, 2008—San Francisco, California

Filed December 24, 2008

Before: Diarmuid F. O'Scannlain, Ronald M. Gould, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge Bea

**COUNSEL**

Janet Belcove-Jalin, William H. Heaivilin, Lynne P. Bigley, Nevada Disability Advocacy & Law Center, Las Vegas, Nevada, for the plaintiffs-appellants.

James R. Hales, Rowe & Hales, Minden, Nevada; David B. Lockie, Lockie & MacFarlan, Elko, Nevada, for the defendant-appellee.

David A. Campbell, Jonathan Damon, LeBoef, Lamb, Greene & Macrae, Chicago, Illinois, for the amicus.

---

**OPINION**

GOULD, Circuit Judge:

We consider Individuals with Disabilities Education Act ("IDEA") claims and a Rehabilitation Act claim of twins, JG and NG, who have autism, and of their parents, RG and SG (unless otherwise indicated, "Appellants" refers to all four Appellants). The controversy arises out of the school district's delay in notifying the twins' parents that it would evaluate the twins for disabilities; from the amount of time it took the school district to diagnose them with autism; from the challenges that confronted the school district in its implementation of an Individualized Education Program ("IEP") for each of the children; and from the school district's alleged discrimination against the children by segregating them into a preschool for developmentally delayed youngsters.

Appellants JG and NG are twin brothers who exhibited delays in their speech patterns and other developmental difficulties. On May 3, 2003, their mother took them to a free screening at the Brain Power Community Learning Center ("the Center"). The Center offers private services for children

with disabilities. The Center referred the twins to the Douglas County School District ("the District") and told their mother that the District had a program for developmentally-delayed children called the TEDDY program.[1]

On May 5, 2003, the twins' mother went to the District's Child Find Office and received a two-page questionnaire for each child. She completed the questionnaires, and the District's Child Find Office confirmed receipt of both questionnaires on May 7, 2003. The parties agree that IDEA required the District to provide Appellants with notice of a proposal to evaluate the twins and a copy of IDEA's procedural safeguards on May 7, 2003. 20 U.S.C. § §1415(b)(3), (d)(1)(A) (2000). The District, however, did not notify the parents that it would conduct evaluations of the twins until August 15, 2003. IDEA also required the District to evaluate the children within a reasonable time of the May 7 date. 34 C.F.R. § 300.343(b) (1999). Although the District began administering tests to evaluate the twins as early as June 20, 2003, it did not complete until August 15, 2003, any evaluation of the children. It did not begin to evaluate the twins for autism until September 25, 2003.

The District referred the twins to its Child Find Day on June 20, 2003. The twins' mother asked if the twins could be tested earlier, but the District's Special Education Teacher who reviewed the twins' initial forms did not have a high level of concern and did not advance the test date.

Without notice that the District would evaluate the twins, Appellants obtained private evaluations for the twins from the Center. On May 14, 2003, the Center evaluated the twins, and the twins began receiving special education services one week later.

---

[1]TEDDY stands for Teaching Early Developmentally Delayed Youngsters.

On June 20, 2003, the twins attended the District's Child Find Day. Their mother listed "speech development" as her primary concern and crying, tantrumming, and toileting as other behavioral issues. She also told the District's Special Education Teacher that both attended the Center for speech problems. The Special Education Teacher and the School Speech Pathologist each gave tests to the twins and received a lack of responses. This lack of responses showed that the twins were developmentally delayed, and the Special Education Teacher concluded that she could not conduct further screening at that time. The Special Education Teacher scheduled an assessment meeting on August 15, 2003, to conduct more individualized testing. The Special Education Teacher informally expressed that the District could use the scores from the tests the Center had administered, but she did not make a specific request for the records.

Also in mid-June, the Center Discrete Trial Trainer,[2] an individual trained in working with autistic children, met the twins. She observed them for several weeks at the Center and at home. The Center Discrete Trial Trainer started working with the twins on July 15, 2003, but it took several more weeks before she could begin her assessment of either of them and another two weeks after that before she implemented discrete trial training. Thus, although the Center had begun testing the twins for autism in May, it was still assessing the twins for autism in July.

By late July, some of the Center staff believed that the twins were autistic. On July 28, 2003, the Director of the Center contacted the District's Special Education Director and relayed the Center's suspicions. The Director of the Center said that the Center Speech Pathologist, who had worked with

---

[2]Discrete Trial Training is a commonly-used therapy for Autistic children: The teacher prompts the child, then the child responds with a behavior and finally there is a consequence—some type of positive reinforcement.

the twins the longest, did not believe that the twins had autism. On the same day, the twins' mother called the District to ask if the assessments could be scheduled earlier. The District did not change the test date.

On August 15, 2003, the District conducted an assessment of each twin and held an assessment meeting. At that time, the twins' parents received a copy of the Notice of Parent Rights, and their mother signed a "Parent Consent to Evaluate" form. The parents and the Special Education Teacher also filled out Early Childhood Screening Profiles for the twins. The District staff worked with the twins for more than an hour but was unable to get responses from either of the twins on many questions. The tests that the staff members were able to administer supported the conclusion that the twins had "developmental delays with speech delay as a major concern."

Despite the July 28 phone call from the Center, the August 15 assessments did not include any tests for autism. In fact, the School Special Education Director had not relayed the Center's suspicions to the School Psychologist, who would have administered any tests for autism. Determining whether a student has autism requires many assessments and takes a good deal of time. Some of the tests require observation of the student for more than a month because it is helpful to get to know a child before assessing him or her.[3]

On August 25, 2003, the District held an IEP meeting with the twins' mother. At the meeting, the District presented her with pre-written IEPs as draft copies, and the District found the twins eligible for services under the developmentally

---

[3]The Center administered the Child Autism Rating Scale autism test on the first day of its evaluations, but the Center's Discrete Trial Trainer took several weeks to complete the assessments. The record is unclear when the Center concluded the twins had autism. But the July 28, 2003, conversation with the District only relayed that the Center *suspected* the twins were autistic. Thus, the Center was not certain in its diagnosis more than two months after it began evaluating the children.

delayed category and offered services. The IEPs did not mention autism.

The twins' mother attended the August 25, 2003, meeting with a binder labeled "Autism," and the School Psychologist asked if there were concerns regarding the twins being autistic. The twins' mother responded that the Center staff thought that the twins could be autistic but that they were not sure.

On August 25, 2003, the twins began attending the District's TEDDY program. They continued receiving services at the Center to supplement the program.

On September 25, 2003, one month after the School Psychologist and two months after the Special Education Director had heard about the possibility of autism, the School Psychologist began assessing the twins for autism. On October 1, 2003, the parents sent the District a letter stating that the twins had been evaluated as having autism and requesting payment for Center services.

On October 7, 2003, the District asked the parents to sign a Consent for Release of Information from the Center. They refused. The twins' mother agreed, however, to bring the Center staff to a meeting on October 8, 2003. At that meeting, the Center shared some data. The parents said that they would not provide more information from the Center unless the District paid for it.

On October 9, 13, and 16, 2003, the School Psychologist completed several tests to determine whether the twins were autistic. She determined that both twins were mildly-moderately autistic. The District began working on new IEPs to propose for the twins.

On October 9, 2003, the Special Education Teacher told the mother about her concern that she would not be able to implement the newly proposed IEP. She became comfortable with

her ability to implement the IEPs by early November, after learning that the District would provide her with more training.

Both twins began exhibiting new inappropriate behaviors during the week of October 9, 2003. These included choking their younger brother, stomping on books, and tearing up books. The twins, however, had improved since they enrolled in the TEDDY program, with a decreased resistance to toileting and an increased ability to follow directions and rules.

The parents removed the twins from the TEDDY program on October 13, 2003, expressing concern about the new problem behaviors. The parents again asked the District to pay for the twins to attend the Center.

On October 17, 2003, the District held a meeting to update the twins' IEPs with the autism results. The District determined that both twins were eligible as autistic: the District found JG eligible at an October 21, 2003, meeting and NG eligible at a November 4, 2003, meeting. The District proposed new IEPs that added time for discrete trial training, extended school year, and functional behavior analysis at the twins' home and school.

On October 30, 2003, the twins' mother called the District and asked who would conduct the discrete trial trainings and where they would be held. The District Program Specialist responded that it had contracted with two private behavior analysts for support in implementing the discrete trial training program.

In early November 2003, the parents rejected the twins' IEPs. They wanted the Center Discrete Trial Teacher to continue working with the twins. The District had considered hiring her, but she did not have early childhood authorization. She was also reluctant to work for the District except in a supervisory role.

On November 10, 2003, the Special Education Director wrote a letter to the parents in which she described the proposal for a Free Appropriate Public Education ("FAPE"), refused to pay for the Center's services, and stated that the District would deliver the discrete trials in a one-on-one and small group basis.

The parents stopped sending the twins to the Center in mid-November because the parents could no longer pay for the services. The parents chose to keep the twins at home, and the twins did not receive any services.

On December 4, 2003, Appellants requested a due process hearing. The Hearing Officer held a hearing from February 16-20, 2004. She found that the District had committed procedural violations by not evaluating the twins in a timely manner. She concluded that Appellants should be compensated for services between August 13 and August 25, awarding $800.00 to compensate for those services.

The parties appealed, and on September 2, 2004, the State Review Officer adopted all of the Hearing Officer's findings of fact but reversed her decision awarding the $800.00. The State Review Officer concluded, however, that the District had denied the twins a FAPE when it did not provide Appellants with a notice of proposal to evaluate and notice of procedural safeguards on May 7. The State Review Officer ordered the District to compensate Appellants fifty percent of the cost of obtaining the Center's evaluations, a total of $835.

On September 28, 2004, Appellants appealed to the district court. They also alleged discrimination in violation of section 504 of the Rehabilitation Act of 1973. The district court affirmed the State Review Officer's decision, granted the District's motion for summary judgment on the discrimination claim, and denied Appellant's cross-motion for summary judgment. Appellants filed a timely notice of appeal.

On appeal, Appellants argue (1) that the district court abused its discretion in reducing their award by fifty percent for equitable reasons and abused its discretion by not awarding them the costs of services; (2) that the August 2003 IEPs were not adequate IEPs and did not provide the twins with a FAPE; (3) that JG's October 2003 IEP and NG's November 2003 IEP did not provide the twins with a FAPE; and (4) that the district court erred in granting the District's motion for summary judgment and denying Appellants' motion for summary judgment on the Rehabilitation Act claim.

## STANDARD OF REVIEW

We review the district court's findings of fact for clear error, even when the district court based those findings on an administrative record. *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007); *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001). We review the district court's conclusions of law *de novo*. *Amanda J.*, 267 F.3d at 887.

In IDEA cases, unlike other cases reviewing administrative action, we do not employ a highly deferential standard of review. *Id.* Nevertheless, complete *de novo* review "is inappropriate." *Id.* We give "due weight" to the state administrative proceedings. *Van Duyn*, 502 F.3d at 817. "[T]he fact-intensive nature of a special education eligibility determination coupled with considerations of judicial economy render a more deferential approach appropriate." *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 n.4 (9th Cir. 2007). We give particular deference to "thorough and careful" administrative findings. *R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (internal quotation marks and citation omitted).

**Analysis**

Children with disabilities are entitled to a free public education, and they are entitled to education designed and tailored to be appropriate to their disabilities. By these means disabled children will be integrated into society and enhance their personal well-being and their important societal contributions. Congress enacted IDEA to ensure that children with disabilities receive a FAPE. 20 U.S.C. § 1412(1) (2000). The Supreme Court has previously said that a FAPE must provide a "basic floor of opportunity" to disabled students, not a "potential-maximizing education." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 201 & n.23 (1982). In cases brought under § 1415(e)(2), we consider, first, whether the state complied with the procedures set forth in the Act,[4] and, second, whether

---

[4]In *Amanda J.*, we stated:

> In addition to establishing substantive requirements, the IDEA also includes procedural safeguards which, if violated, may prevent a child from receiving a FAPE. Among the most important procedural safeguards are those that protect the parents' right to be involved in the development of their child's educational plan. Parents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know. To guarantee parents the ability to make informed decisions about their child's education, the IDEA grants them the right to "examine all relevant records" relating to their child's "identification, evaluation, and educational placement," as well as "to obtain an independent educational evaluation" of their child if they disagree with what the school district or state agency has found. 20 U.S.C. § 1415(b)(1)(A). "[P]arents have the right to 'present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of [a FAPE] to such child.' " 20 U.S.C. § 1415(b)(1)(E). After making their complaint, the parents are entitled to "an impartial due process hearing . . . conducted by the State educational agency or by the local educational agency or an intermediate educational unit, as determined by State law or by the State educational agency," 20 U.S.C. § 1415 (b)(2), and if either party is dissatisfied with the state educational agency's review, they may bring a civil action in state or federal court, 20 U.S.C. § 1415(e)(2).

*Amanda J.*, 267 F.3d at 882 (footnote omitted).

the individualized educational program developed through the Act's procedures was reasonably calculated to give the child appropriate educational benefits.[5] *Id.* at 206-07.

Compliance with IDEA procedures is "essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parental participation are particularly important." *Amanda J.*, 267 F.3d at 891. "When the elaborate and highly specific procedural safeguards embodied in [IDEA] are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid." *Rowley*, 458 U.S. at 205.

A.     Remedies for the District's Procedural Violation

[1] IDEA requires school districts to provide "[w]ritten prior notice to the parents of the child . . . whenever the local education agency . . . (A) proposes to initiate or change; or (B) refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. §1415(b)(3) (2000). The District did not provide Appellants with this notice until August 15, 2003, but it should have provided the notice on May 7, 2003.

---

[5]We also noted that:

> The IDEA provides states with federal funds to help educate children with disabilities if they provide every qualified child with a FAPE that meets the federal statutory requirements. Congress enacted the IDEA "to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs . . . ."

*Amanda J.*, 267 F.3d at 882 (footnote omitted) (quoting 20 U.S.C. § 1400(c) (1994)).

**[2]** Both parties agree that the District committed a procedural violation when it did not inform Appellants of its impending evaluations of the twins and that this violation deprived the twins of a FAPE. Appellants argue, however, that the remedy imposed by the district court was an abuse of discretion. Specifically, Appellants urge us to hold that they should receive a full reimbursement for the Center's evaluations of the twins and reimbursement for the Center's services between June 23 and August 25, 2003.

Under IDEA, the district court has the power to grant appropriate relief in equity. 20 U.S.C. § 1415(i)(2)(B) (2000); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985). A district court reviews the conduct of both parties in fashioning relief. *W.G. v. Bd of Trs. of Target Range Sch. Dist.*, 960 F.2d 1479, 1486 (9th Cir. 1992). We review the district court's equitable award for abuse of discretion. *Forest Grove Sch. Dist. No. 23 v. T.A.*, 523 F.3d 1078, 1084-85 (9th Cir. 2008).

1.    Reimbursement for the Center's Evaluations

**[3]** Appellants argue that they were not legally obligated to share the Center's evaluations and that the reduction in their award unfairly punishes them. A school district has an independent duty to evaluate children after notice that they may have learning disabilities. 20 U.S.C. §§ 1412 (a)(3),(7)(2000); *id.* § 1414; *N.B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, 1209-10 (9th Cir. 2008).

**[4]** Notwithstanding the parents' conduct, the District was duty-bound to evaluate the twins. In *Target Range*, we concluded that even though the parents had agreed to secure the child's private school's participation in an IEP meeting, the school district had to ensure that the private school participated. *Target Range*, 960 F.2d at 1484-85. Although we held that the parents' actions were relevant in determining relief, we did not reduce their reimbursement. *Id.* at 1486. In another

case, the parents did not turn over a full doctor's report about their child. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994). This also did not excuse the school district's obligation to obtain evaluations for itself, and those parents were also entitled to a full reimbursement. *Id.* at 1527.

[5] Appellants did not receive notice that the District would evaluate the twins. Shortly after they should have received notice, they took their children to a private Center to evaluate them. The conduct of the parents in seeking private evaluation was reasonable when they were not told that the District would conduct evaluations of their children. Even if Appellants had shared the Center's results with the District, the District's obligation to conduct its own evaluations remained. *Target Range*, 960 F.2d at 1484-85; *Union Sch.*, 15 F.3d at 1524. Appellants' refusal to share this information, therefore, did not harm the District. It had to obtain its own evaluation. It would be improper to reduce Appellants' award when their conduct did not harm the District. *See* 1 Dan B. Dobbs, Law of Remedies §2.4(2), at 96 (2d ed. 1993) (discussing reducing equitable awards for unclean hands and stating "the plaintiff's remedy against the defendant should not be denied unless his misconduct has actually harmed the defendant, or has at least put the defendant in substantial risk of harm from that misconduct").

[6] Appellants' refusal to share information that they had no obligation to share has no connection to the District's violation of IDEA's notice provisions. Appellants did not absolutely refuse to share this information until October, long after the District's violation of its duty to give notice of planned evaluations had occurred. Because no causal connection exists between the parents' refusal to share the information they gained from the Center and the District's prior delay in providing them notice, Appellants are entitled to a full reimbursement. *See id.* at 95 (noting that "courts are agreed that the plaintiff's improper conduct, whatever it is, must be related in

some substantial and significant way to the claim he now asserts" for the court to reduce equitable relief).

**[7]** We conclude that the district court abused its discretion when it affirmed the award of only half of the costs of the twins' evaluations. Appellants are entitled to $1,670.00, the full reimbursement for the twins' evaluations.

2.   Reimbursement for the Center's Services

Although in some cases we have reviewed the question of reimbursement *de novo*, we have recognized that this was not in keeping with the text of the statute nor the dictates of Supreme Court precedent. *Forest Grove*, 523 F.3d at 1084-85. Thus, we review the denial of reimbursement for abuse of discretion.

Appellants contend that the district court abused its discretion when it did not grant equitable relief for the loss of services. The district court concluded that no relief was appropriate because the twins were not entitled to services during that time. Appellants argue that they paid for services during this time because they did not know that the District would provide services; that the twins needed the services; and that the twins should have been eligible for services after June 23, but the District had unreasonably delayed the evaluations.

The District violated IDEA when it did not provide Appellants notice of the procedural safeguards of IDEA. 20 U.S.C. § 1415(b)(3) (2000). Those safeguards, however, only notify the parents about a pending evaluation. The District must provide services only upon a determination of eligibility. *Id.* §§ 1414, 1415(j). It would be incongruous to compensate Appellants for services before the District had determined the twins were eligible for them.

Appellants also argue the twins needed services. The twins' needs, however, have no bearing on the procedural violation

that occurred on May 7, 2003. Further, had the Appellants received notice of IDEA procedures, they would have learned that the District had no obligation to provide services until after the twins' evaluations. This would likely have led Appellants to obtain services on their own.

The State Review Officer found and the District Court affirmed that the August 25, 2003, evaluations were timely under IDEA. Appellants argue that the evaluation delay was unreasonable.[6] The District argues that it complied with the state administrative rule, a forty-five-school-day timeline for evaluating children. Nev. Admin. Code § 388.377(1)(A). We consider what deference, if any, must be given by us to the Nevada regulation based on the fact that the Secretary of Education approved it when determining to disburse IDEA funds. We also consider whether, regardless of the Nevada regulation, the District's actions in this instance were reasonable.

a.   The Nevada Statute and IDEA

[8] IDEA "leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, [but] it imposes significant requirements to be followed in the discharge of that responsibility." *Rowley*, 458 U.S. at 183. It requires that a school district conduct an evaluation in a reasonable time. Assistance to States for Education of Children With Disabilities and the Early Intervention Program for Infants and Toddlers with Disabilities, 64 Fed. Reg. 12406, 12440 (Mar. 12, 1999) (implementing 34

---

[6]It may be argued that this issue was not raised because it was not made explicit in Appellants' opening brief and it should be deemed waived. *Rattlesnake Coal. v. U.S. Envt. Prot. Agency*, 509 F.3d 1095, 1100 (9th Cir. 2007). However, we think a fair reading of the opening brief implicitly raises this issue and the Center's brief argued that its evaluations were timely, and so we do not hold this argument waived. *See Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir. 2004) (holding that an exception to the waiver rule exists when the failure to properly raise the issue caused no prejudice to the opposing party).

C.F.R. § 300.343). But it allows states to establish their own procedures. The Act ensures compliance by conditioning funds on the Secretary of Education approving those procedures. 20 U.S.C. § 1412(a) (2000).

[9] Although the text of the statute is silent on evaluation timeliness, the Secretary of Education has promulgated regulations that impose a "reasonable time" requirement. *See id.* §1414(a) (2000); 34 C.F.R. § 300.343 (1999). Specifically, in 1999 the Secretary implemented a regulation that stated: "Each public agency shall ensure that within a reasonable period of time following the agency's receipt of parent consent to an initial evaluation of a child- (i) The child is evaluated . . . ." 34 C.F.R. § 300.343 (1999). We have also required a timely evaluation in all areas of suspected disabilities. *See Hellgate Elem. Sch. Dist*, 541 F.3d at 1209-10 (concluding that a district that did not obtain an evaluation for autism for six months denied the child a FAPE).

Department of Education letters interpreting and explaining IDEA have also emphasized the need for an initial evaluation to occur within a reasonable time. The Office of Special Education Programs, the principal office for administering IDEA, has stated that an initial evaluation must be conducted "without undue delay." Letter from Thomas Hehir, Dir., Office of Special Educ. Programs, to Jerry Saperstone, Mental Health Services System, 21 IDELR 1127 (OSEP 1994); *see also* 20 U.S.C. § 1402 (2000). That Office also noted that the determination of whether a school district did not conduct a timely evaluation according to IDEA and applicable state standards must be made on a case-by-case basis. Letter from Stephanie Smith Lee, Dir., Office of Special Educ. Programs, to Beth Davis-Wellington, Children's Advocacy Network (Aug. 19, 2003) *available at* http://www.ed.gov/policy/speced/guid/idea/letters/2003-3/davis081903fape3q2003.pdf.

[10] In 1999, the Department of Education declined to impose a specific timeline, stating that doing so "could result

in the timelines being implemented only in a compliance sense, without regard to meeting the spirit of the requirement . . . . Although no specific timeline is given, implementation should be done with all due haste." 64 Fed. Reg. at 12581. The Secretary's refusal to adopt a specific timeline also supports the conclusion that the reasonableness of a child's evaluation depends on the individual circumstances.[7]

The Secretary of Education's determination that a state's procedures comply with IDEA is entitled to some level of deference.[8] *See Lukhard v. Reed*, 481 U.S. 368, 381 (1987) (noting the Secretary of Health and Human Services was entitled to substantial deference in his conclusion that a state's regulation that included personal injury awards in determining a family's "income and resources" was consistent with HHS regulations that were silent on that issue). The Secretary's finding that Nevada's regulations comply with IDEA requirements "constitute[s] a body of experience and informed judgment to which [we] may properly resort for guidance." *See Skidmore*

---

[7]A year after the events in this case occurred, Congress amended the Act to allow for more state discretion in imposing timelines for an evaluation. The 2004 amendments to the Act require evaluations to occur "within 60 days of receiving parental consent for the evaluation, or, if the State establishes a timeframe within which the evaluation must be concluded, within such timeframe." 20 U.S.C. § 1414(a)(1)(C)(i)(I) (Supp. V 2005). In promulgating regulations to implement this part of the statute, the Department of Education explicitly declined to state that sixty days was the maximum timeframe. Instead, it stated the Act was intended "to permit States to make reasoned determinations of the appropriate period of time in which evaluations should be conducted based on particular State circumstances." Assistance to the States for Education of Children with Disabilities and Preschool Grants for Children with Disabilities, 71 Fed. Reg. 46540, 46637 (Aug. 14, 2006). We do not reach issues relating to the interpretation of the statute as amended.

[8]Although a state agency's interpretation of federal law is not entitled to deference, *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495 (9th Cir. 1997), the Secretary's approval of that agency's interpretation is due some deference because it shows a federal agency's interpretation of the federal statute that it is charged to administer.

*v. Swift & Co.*, 323 U.S. 134, 140 (1944). While we recognize the Secretary has this experience and judgment, we do not have the benefit of a written interpretation or formal opinion. Moreover, when the Secretary approved the Nevada regulation generally as a condition to the state receiving federal funds, he did not indicate that he determined that the time limit was reasonable in each case. As such, we do not give the Secretary's judgment much weight.

[11] We hold that Nevada's forty-five-school-day timeline is not an inconsistent interpretation of IDEA's reasonable timeliness requirement. We do not hold, however, that it provides school districts with a safe-harbor under the applicable statute. Regardless of compliance with a state regulatory requirement, IDEA requires that districts act within a reasonable time to evaluate potentially disabled children. To be sure, a failure to comply with the state's regulation is good evidence of unreasonable delay.[9] But compliance with the regulation will not necessarily mean that in each case the school district completed its investigation in a reasonable period. We are impressed that the purposes of the IDEA will be best fulfilled when school districts act as expeditiously as is practically possible to complete the evaluations of disabled children.

IDEA requires courts to consider each child's case individually. *See generally Rowley*, 458 U.S. 176. To allow a state to use its regulations as a safe harbor in the absence of a congressional directive or regulation allowing for such would flout Congress's intent that judicial review of IDEA claims be child-specific. Compliance with the state regulation is relevant and should be considered, but the ultimate and dispositive question is whether the District acted in a reasonable time.

---

[9]Indeed, a violation of the state regulation would be actionable. *Target Range,* 960 F.2d at 1483 ("State standards that are not inconsistent with federal standards [under IDEA] are also enforceable in federal court.").

b.   The Reasonableness of the Evaluation Timeframe

The District was required to give Appellants notice and a consent form on May 7, 2003. From that date until August 25, 2003, when the twins began receiving services, is 110 calendar days and thirty-eight school days.

**[12]** The 110-day delay was reasonable in this case. Nothing occurred at the June 20 Child Find Day that indicated the District should expedite the evaluations. The earliest the District had any notice of suspected autism was July 28, 2003. The District began evaluating the twins one month later and began administering tests for autism one month after that. The Hearing Officer credited testimony that stated this one-month delay was essential to produce valid test results. Premature testing without requisite trust and comfort level between child and evaluator would be ineffective. Based on the testimony that the Hearing Officer considered credible, the delay was not unreasonable.

**[13]** Small administrative delays, like this one, and especially delays needed to promote effective test results, should not render the District's actions unreasonable. It also makes sense to allow school districts a degree of leeway during summer vacation. *See Doe v. Metro. Nashville Pub. Schs.*, 9 F. App'x. 453 (6th Cir. 2001) (upholding a six-month delay where the child was out of state, it occurred over the holidays, and it was difficult for the school to obtain requested information).

Our holding does not encompass a situation where a school district simply delays in the face of a referral for a potentially autistic child solely because summer vacation makes a timely evaluation difficult. In *Adams v. Oregon*, the school district reduced a child's services to accommodate district staff's summer vacation plans. 195 F.3d 1141, 1144 (9th Cir. 1999). The reduction had no bearing on the child's unique needs and therefore deprived the child of a FAPE. *Id.* at 1150-51. The

school district in *Adams* knew that the child had an urgent need for services. *Id.* In our case, the District did not have knowledge or even notice of the twins' autism until about two weeks before the scheduled assessments.

In *Hellgate*, the district learned a student was potentially autistic in August, referred him to another institution for an autism evaluation in November, and then did not obtain the evaluation until March. *N.B. v. Hellgate Elementary Sch. Dist.* 541 F.3d at 1205-06. We concluded that this resulted in a denial of a FAPE. *Id.* at 1208. Here, the District completed the twins' evaluations within three months of receiving notice that the children potentially suffered from autism.

We give "due weight" to the administrative proceedings. *Van Duyn*, 502 F.3d at 817. The State Review Officer carefully considered the record and found the District evaluated the twins in a reasonable timeframe. Specifically, the State Review Officer found the Hearing Officer's conclusion that extended school year days should be included in the forty-five-school-day timeline was error. Without including those days, the District had complied with the timeline. He further found that the District had evaluated the twins in a reasonable time. He noted that this was not a case, like *Adams*, where the District had reduced services solely for its own convenience. Rather, the State Review Officer concluded that the District needed to coordinate its obligations to many children over the summer while also meeting the forty-five-school-day timeline. Relying on the Hearing Officer's finding that the District staff had no reasonable basis to suspect the twins were autistic on June 20, 2003, he concluded that the August 15, 2003 assessment date was reasonable. Having considered the record and the arguments presented by the parties as well as the applicable law, we will not disturb the State Review Officer's finding.

[14] We hold that the district court abused its discretion in reducing the reimbursement of evaluation costs. The district

court did not abuse its discretion in declining to award costs for services that the twins received between June 23 and August 24, 2003.

## B.   The August 2003 IEPs

### 1.   Alleged Procedural Violation

Appellants argue that the District did not comply with procedures set forth in the Act in conducting the August 25, 2003, evaluations. Specifically, Appellants urge us to conclude that the District did not conduct a proper evaluation because it did not test the twins for autism before it finalized the August 2003, IEPs. Appellants further assert that even if the District did comply with IDEA procedures in conducting the evaluations, the developed IEPs were not reasonably calculated to benefit the twins.

The district court found that the August 25, 2003, evaluations were "full and individual initial evaluations," as required by IDEA. 20 U.S.C. § 1414(a)(1)(A) (2000). IDEA requires that a school district use "a variety of assessment tools and strategies . . . [and] use technically sound instruments." *Id.* § 1414(a)(2)(A),(C). Any standardized tests must "have been validated for the specific purpose for which they are used; . . . administered by trained and knowledgeable personnel; and . . . administered in accordance with any instructions provided by the producer of such tests." *Id.* § 1414(b)(3). The evaluations must be "sufficiently comprehensive to identify all of the child's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.532(2)(h) (1999).

Appellants argue that the District did not fulfill these requirements and that the District did not evaluate the twins within the meaning of IDEA. Appellants contend that the District should have assessed the twins using Wechsler's Pre-

school and Primary Scales of Intelligence, the Childhood Autism Rating Scale, and the Peabody Picture Vocabulary Tests. The District used these tests in October.

The District responds that administering these tests in August would have violated IDEA's requirement that it administer the assessments in the manner most likely to yield accurate information. *Id.* These tests would not yield valid results until the twins had become familiar with the District staff, particularly in light of the twins' unwillingness to respond to the staff's questions.

The District administered several tests before the August 25, 2003, IEP meeting: the twins' mother completed a questionnaire on May 5, 2003; a District staff member gave Assessments of Phonological Process on June 20, 2003; and the District administered AGS Early Screening Profile Home/ Health Questionnaires providing information about parent/ child interactions and the twins' health.

The Hearing Officer, State Review Officer, and district court all found the August evaluations were evaluations within the meaning of IDEA, crediting the District's staff testimony about the dubious reliability of tests administered too early. While the Center administered some autism tests quite early, the Discrete Trial Teacher did not even begin evaluating the twins until one month after she began observing them—month after they began attending the Center, lending further credence to the District's contentions. Some of the staff at the Center did not believe the twins were autistic as late as August 15, 2003. Thus, although the Center had stated its suspicions as early as July 28, 2003, its results then were not definitive.

[15] The Hearing Officer's findings were "thorough and careful" and are thus due greater deference. *See Napa Valley Unified Sch. Dist.*, 496 F.3d at 937 (internal quotation marks and citation omitted). The Hearing Officer found the District

Psychologist's testimony credible and she noted that some of the mandatory tests for autism require observation of the child for over a month. Giving the Hearing Officer due deference, we agree that the District could not effectively administer the autism tests until after the test administrators had gotten to know the twins. Because the District could not immediately administer the tests for autism in a valid manner, as required by IDEA, the August evaluations qualify as initial evaluations under IDEA. 34 C.F.R. §§ 300.531, 300.532 (1999).

In *Hellgate,* we determined that the IEP team could not develop a plan reasonably calculated to provide the child with a meaningful educational benefit for the school year without an autism evaluation. *Hellgate Elem. Sch. Dist.*, 541 F.3d at 1209-10. The district in *Hellgate* received notice that the child could be autistic in August but did not obtain an evaluation and convene an IEP meeting to address the child's autism until March. *See id.* at 1205-06. By contrast, the District here convened IEP meetings to address the twins' autism within two months of finalizing the original IEPs. The District had taken the time necessary to conduct proper and valid assessments and then had begun addressing what additional services the twins needed.

Because we hold that the August evaluations qualify as initial evaluations under IDEA, we reject the contention that there was at the outset a lack of evaluations resulting in the denial of a FAPE.

2.  Alleged Substantive Violation

Appellants also argue that the August IEPs were not reasonably calculated to provide the twins with educational benefits because the IEPs did not address the twins' autism. We consider the IEP at the time of its implementation, not in hindsight, and ask if its methods were reasonably calculated to confer an educational benefit on the child. *Adams*, 195 F.3d at 1149.

The twins received ninety minutes of speech and language services twice a week, and the Special Education Teacher individualized the twins' services in the TEDDY program by relying on index cards. These services gave the twins educational benefits. Importantly, the District was pursuing autism eligibility determinations. The District, however, reasonably calculated that the August IEPs could confer educational benefits on the twins based on the tests that the District could validly administer in August. Further, the twins made progress in certain areas while they attended the TEDDY program. Their IEPs that were developed after the autism determination continued their placement in the TEDDY program.

Finally, Appellants also argue that the twins' August IEPs were not individually tailored.[10] IDEA requires IEPs be individual tailored to the unique needs of each child. *Amanda J.*, 267 F.3d at 894. The August 15, 2003, assessments only showed one difference between the twins regarding motor skills. Because this was the only distinction between the twins in the tests that the District could validly administer in August, the lack of individualization is not surprising. The District planned more tests as soon as it could effectively administer them.

**[16]** We hold that the District provided the children with a FAPE from August 25 until October 21 and November 4, 2003.

---

[10]Appellants also suggest that it was impermissible that the District began the August IEP meeting with identical pre-written IEPs. This does not invalidate the substance or development of the IEPs. 64 Fed. Reg. at 12478-79. Appellants put forth no evidence that the District presented the IEPs in a "take it or leave it" position, which would have constituted error. *See Ms. S. ex rel. G., v. Vashon Island Sch. Dist.,* 337 F.3d 1115, 1131 (9th Cir. 2003).

C.   The October and November IEPs.

Appellants also raise a substantive challenge to the October and November IEPs. They contend that the District could not implement the October and November IEPs and that these IEPs were not reasonably calculated to confer an educational benefit. Specifically, Appellants argue that the District had no behavior analyst on staff. A behavior analyst would be qualified to perform functional analysis and supervise the staff in the implementation of a discrete trial training program. The District responds that IDEA does not require a district to employ a behavior analyst. Rather, it requires the District to employ an individual with Nevada State Education Agency-recognized certification, licensing, or registration. 34 C.F.R. § 300.23.

The Hearing Officer's detailed findings of fact, adopted by the State Review Officer and affirmed by the district court, demonstrate that the District did have personnel capable of implementing the IEPs. The District had contracted with two private behavior analysts for support in implementing the discrete trial training program.[11] Trained personnel from the University of Nevada would perform functional behavior analysis at the twins' home and school.

The District Special Education Teacher had been concerned about her abilities to implement the IEPs in early October. After she learned the District would provide her with additional training, she stated that she felt confident that she could implement the IEPs. Although the parents preferred that the

---

[11]Appellants also argue that the independent contractor would use the twins as guinea pigs for training. A District staff member testified that the behavior analysts would "train our staff members using [JG] and examples with him, but that since they were not going to be there 15 hours a week their function was to build capacity amongst our people." The testimony suggests that the behavior analysts would deliver some discrete trials to the twins as examples to help train the teachers. It does not suggest that they would have an untrained teacher deliver discrete trials.

District hire the Center's discrete trial training instructor, we focus on the District's proposed implementation plan, not the parents' preferred alternative. *See Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987).

The District must implement an IEP as soon as possible, but the District has a reasonable amount of time to do so, particularly where the circumstances require a short delay. 64 Fed. Reg. 12440 & 12579 (March 12, 1999) (implementing 34 C.F.R. § 300.342 and comments). The evidence shows that the District would have had qualified staff within a reasonable amount of time, but the parents did not allow the District to provide services.

**[17]** We hold that the District had adequate resources to implement the October and November IEPs.

D.   The Rehabilitation Act claim

For the first time in district court, Appellants added a Claim of discrimination under the Rehabilitation Act. Appellees argued that this claim was improperly presented because it was unexhausted. They also argued that the claim should lose on its merits. The District first made the exhaustion argument in its reply brief to its summary judgment motion. The District had assumed the Rehabilitation Act claim was a claim for a denial of a FAPE, not an unexhausted claim that the District had discriminated against the twins by segregating them. Appellants argue that the district court erred in granting the District's summary judgment motion and denying their cross-motion for summary judgment.

The grant or denial of summary judgment is a conclusion of law, reviewed *de novo*. *See Amanda J.*, 267 F.3d at 887.

IDEA is not an exclusive remedy for children with disabilities who complain of failures in their education. *See Mark H.*, 513 F.3d at 925 (concluding that the availability of relief

under IDEA does not limit the availability of relief under the Rehabilitation Act). Nevertheless, IDEA requires that when a plaintiff files an action that seeks relief under another statute, and that relief is also available under IDEA, he or she must follow IDEA exhaustion procedures. 20 U.S.C. § 1415(l) (2000); *Robb v. Bethel Sch. Dist. #403*, 308 F.3d 1047, 1050 (9th Cir. 2002).

Appellants went through the administrative process but did not argue that the District discriminated against the twins by segregating them. Appellants argue that their lack of exhaustion is not fatal to their claim because their segregation claim could not be heard in an IDEA due process hearing. Nevertheless, § 1415(b)(6) allows claims "with respect to *any* matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education" to be heard. 20 U.S.C. § 1415(b)(6) (emphasis added). Further, the parents in *Mark H.* presented their Rehabilitation Act claim during the administrative process, even though the hearing officer did not rule on the issue. Appellants also could have argued their discrimination claim in the hearing. *Mark H.*, 513 F.3d at 927 n.3.[12]

---

[12]The partial dissent argues that because all of the "educational issues" were exhausted, we should conclude that Appellants adequately exhausted their Rehabilitation Act claim. There are two primary problems with the partial dissent's analysis: First, in *Blanchard v. Morton v. School Disrict*, 420 F.3d 918, 920-21 (9th Cir. 2005), we stated that "[t]he dispositive question . . . is whether Blanchard is seeking remedy for injuries that could be redressed to any degree by the IDEA's administrative procedures." *Id.* at 921. As we see it, the ALJ could have ordered the District to place the twins in regular preschool programing, remedying Appellants' alleged injury to some degree. 20 U.S.C. § 1415(k)(3)(B)(ii). Therefore, even under *Blanchard*, exhaustion was required. Second, in *Witte* and *Blanchard*, the parties had resolved "educational issues" to mutual satisfaction, and none of their injuries could have been redressed by recourse to the IDEA exhaustion process. We see a different case where the parties are still litigating their educational issues and the administrative process might have been used in attempt to gain a remedy for their alleged injury.

Appellants argue that the District has waived its exhaustion defense. There is some question regarding whether IDEA's exhaustion requirement is jurisdictional, or whether a district could waive this argument. *See Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 204 (2d Cir. 2007) (discussing recent Supreme Court precedent casting doubt on this issue). The exhaustion requirement reflects " 'the traditionally strong state and local interest in education.' " *Christopher S. v. Stanislaus County Office of Educ.*, 384 F.3d 1205, 1209 (9th Cir. 2004) (quoting *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303 (9th Cir. 1992)). We need not address whether exhaustion under IDEA is a non-jurisdictional claims-processing rule, or a jurisdictional bar. *See Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam). The District did not forfeit the argument. The District raised it as soon as the nature of Appellants' Rehabilitation Act claim became clear. Once the District learned that the claim was not arguing that the District had denied Appellants a FAPE, they moved to amend their answer and asserted the exhaustion defense. The District's treatment of this exhaustion issue in our view was timely.[13]

[18] Appellants did not properly present the claim to the district court. The District had no notice that Appellants considered the twins' placement discriminatory. Therefore, we vacate the district court's order granting the District summary judgment and hold that this claim should have been dismissed without prejudice for lack of jurisdiction.[14]

---

[13]Even though the issue was not raised in the opposition brief, under our precedent we can consider the issue because it was raised explicitly in the Appellant's brief. *See USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d 1276, 1278 (9th Cir. 1994) (considering an issue that appellant did not raise in opening brief after appellee throughly discussed it).

[14]Finally, Appellants argue that the district court abused its discretion in denying their motion to strike the District's reply brief or in the alternative grant them leave to file a sur-reply. In its reply brief to its motion for summary judgment, the District argued that the Appellants had not

**[19]** For the foregoing reasons, we REVERSE the district court's decision reducing the reimbursement for evaluations, we AFFIRM the district court's decision on all other IDEA claims and on the motion to strike, we VACATE the district court's opinion on Appellant's Rehabilitation Act claims, and we REMAND WITH INSTRUCTIONS that the district court DISMISS that claim without prejudice for lack of jurisdiction. Each party shall bear its own costs on appeal.

**AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART AND REMANDED WITH INSTRUCTIONS.**

---

BEA, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's disposition of Appellants' claims under the IDEA. However, because I do not think the IDEA's exhaustion requirements bar the plaintiffs from pursuing their claims under § 504 of the Rehabilitation Act, I respectfully dissent from the court's holding the district court lacked jurisdiction to hear these claims. I would instead affirm the district court's order granting summary judgment in favor of the Appellee.

---

exhausted the Rehabilitation Act claim and submitted new evidence. We review a district court's decision on a motion to strike for abuse of discretion. *Golden Gate Hotel Ass'n v. City & County of S.F.,* 18 F.3d 1482, 1485 (9th Cir. 1994). Where " 'new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond.' " *Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir. 1996) (quoting *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990) (alteration in original). The district court did not consider the new evidence and its denial of leave to file a sur-reply accordingly did not prejudice Appellants. We hold that the district court did not abuse its discretion in denying Appellants' motion to strike.

In the district court, the Appellants contended for the first time that the District's placement of the twins in the TEDDY program constituted intentional discrimination under the Rehabilitation Act. The Appellants contended the District, rather than making an individualized determination regarding the twins' needs, simply labeled the twins "disabled," and assigned the twins to special education. This, the Appellants claimed, constituted "segregation." The Appellants sought monetary damages, a form of relief unavailable under the IDEA. *See Witte v. Clark County Sch. Dist.*, 197 F.3d 1271, 1275 (9th Cir. 1999).

The IDEA requires a plaintiff to exhaust administrative remedies before filing suit under another statute if the plaintiff is "seeking relief that is also available under" the IDEA. 20 U.S.C. § 1415(l). Though Appellants seek some relief not available under IDEA, they were nevertheless required to pursue those remedies that were available to them in state administrative proceedings; their claims could have been redressed, to an extent, by remedies available under the IDEA. *See Robb v. Bethel Sch. Dist. No. 403*, 308 F.3d 1047, 1050 (9th Cir. 2002).

But here, unlike *Robb*, Appellants are not attempting to "opt out" of the IDEA altogether. *Id.* Appellants have pursued or are pursuing all those remedies available to them under the IDEA. And, in the state administrative proceeding, Appellants contended the District assigned the twins to the TEDDY program without undertaking the individualized evaluation required by law. The plaintiffs in *Robb*, by contrast, failed to file any administrative claim whatsoever. *See id.*

In two cases, we permitted a plaintiff who first seeks administrative relief in state IDEA proceedings to file a separate suit for damages under § 1983 or the Rehabilitation Act. In *Witte*, the plaintiffs sought monetary damages under § 1983, the Rehabilitation Act, and the Americans with Disabilities Act for emotional and physical abuse by school

employees. 197 F.3d at 1276. In *Blanchard v. Morton School District*, the mother of a disabled child sought money damages under § 1983 for emotional distress and lost wages caused by the school district's "deliberate indifference" to her son's IDEA claims. 420 F.3d 918, 919 (9th Cir. 2005). In both *Witte* and *Blanchard*, we held that the plaintiffs were not required to advance the claim for damages in state IDEA proceedings, provided the plaintiff had raised all of the "educational issues" implicated by the child's disability in the IDEA proceeding. *Id.* at 921-22; *Witte*, 197 F.3d at 1275.

In short, *Witte* and *Blanchard* stand for the principle that once a plaintiff has raised all of the "educational issues" associated with an IDEA claim in a state administrative proceeding, nothing prevents him from asserting a claim for damages in district court alleging a defendant school district also violated other statutory provisions. Such an approach fulfills the purposes of exhaustion—providing courts with expert assistance and offering state officials the first opportunity to correct an educational deficiency, *see Robb*, 308 F.3d at 1051— without forcing plaintiffs to engage in the futile gesture of raising damages claims in state administrative proceedings, where the agency lacks the power to award such relief.

Here, Appellants have resolved all of the "educational issues" associated with their claims. Appellants contended in state administrative proceedings that the District's evaluation of the twins was deficient and that the twins' assignment to the TEDDY program did not meet the twins' educational needs. The only new issue raised by Appellants' Rehabilitation Act claim is an allegation that the District acted with discriminatory intent. In the IDEA proceedings, the intent with which a district acts in failing to provide a FAPE is irrelevant; only the result of its actions or inactions matter. Nor is the District's intent an "educational issue" the resolution of which requires the expert guidance of a state administrator. *Cf. Kutasi v. Las Virgines Unified Sch. Dist.*, 494 F.3d 1162, 1169 (9th Cir. 2007).

I would instead affirm the district court's order granting summary judgment in favor of the Appellee. Where a district assigns a student to special education pursuant to a valid IEP, the district is not liable for intentional discrimination under § 504 of the Rehabilitation Act. *Mark H. v. Lemahiu*, 513 F.3d 922, 934 (9th Cir. 2008). Because I agree that the District provided the twins valid IEPs, I would affirm the district court's decision on the merits, rather than conclude the district court lacked jurisdiction over Appellants' Rehabilitation Act claims.