**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

J. L.; M. L.; K. L., their minor
daughter,
*Plaintiffs-Appellees,*

v.

MERCER ISLAND SCHOOL DISTRICT, a
municipal Washington corporation,
*Defendant-Appellant.*

No. 07-35716

D.C. No.
CV-06-00494-MJP

AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
December 10, 2008—Seattle, Washington

Filed August 6, 2009
Amended January 13, 2010

Before: Robert R. Beezer, Ronald M. Gould and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Beezer

## COUNSEL

James J. Dionne, Lisa M. Worthington-Brown, Lynette M. Baisch, Dionne & Rorick, Seattle, Washington, for the defendant-appellant.

Howard C. Powers, Seattle, Washington, for the plaintiffs-appellees.

## OPINION

BEEZER, Circuit Judge:

This appeal stems from Plaintiffs' allegation that Defendant Mercer Island School District ("District") failed to provide K.L. with a free appropriate public education as required by the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1491.[1] The administrative law judge ("ALJ") analyzed Plaintiffs' claims using the free appropriate public education "educational benefit" standard interpreted by the Supreme Court in *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982), and concluded that the District provided a free appropriate public education. The district court concluded that Congress superseded *Rowley* in the 1997 Individuals with Disabilities Education Act amendment and held that K.L. was denied a free appropriate public education. The District appeals.

The district court exercised federal question jurisdiction over the instant case under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291. We hold that *Rowley* continues to set the free appropriate public education standard. We vacate the district court's orders except to the extent that we reverse the district court's conclusion that the District committed procedural violations of the Individuals with Disabilities Education Act that resulted in the denial of a free appropriate public education. We remand to the district court to review the ALJ's determination that the District provided K.L. with educational benefit as required by *Rowley*.

---

[1] In the interest of preserving the family's privacy because K.L. was a minor at all relevant times, we identify Plaintiffs as "K.L.," "Parents," "Mother" and "Father."

# I

K.L. is a student of average intelligence that the District diagnosed with learning disabilities in first grade.[2] For second and third grades, the District educated K.L. in several general education classes upon determining that she would benefit from an education alongside her typically-developing peers for social and academic purposes. To "level the playing field" in K.L.'s mainstreamed general education classes, the District provided K.L. with accommodations. The District also provided K.L. with specially designed instruction (i.e., "special education") in reading and writing in a "resource room" for special students. For fourth and fifth grades, Parents paid for K.L. to attend a private school serving children with reading and writing difficulties.

K.L. returned to the District for her sixth grade education at Islander Middle School. The District reevaluated K.L. and determined that she was still eligible for special education. K.L.'s intelligence quotient ("IQ") revealed that she was in the average range at the low end. In accordance with K.L.'s individualized educational program, the District educated K.L. with specially designed instruction in reading, writing and mathematics. The District provided K.L. with accommodations in her general education classes including peers to help her read and take notes, use of spelling software, modified instructions, alternate exam methods, reduced assignments and extra time for assignments. K.L. ended her sixth grade year with an "A-" in special education reading, an "A-" in special education language arts, a "B+" in special education mathematics, an "A" in special education structured study, an "A-" in general education science, a "pass" in general education art and a "pass" in general education Spanish.

---

[2]This factual background reflects our "particular deference" to the ALJ's "thorough and careful" administrative findings. *See JG v. Douglas County Sch. Dist.*, 552 F.3d 786, 793 (9th Cir. 2008).

In seventh grade, K.L. continued with largely the same individualized educational program that she followed in sixth grade after her individualized educational program team concluded that the program was effective. At the end of seventh grade, K.L. received an "A-" in special education language arts (i.e., reading and writing), an "A" in special education mathematics, an "A-" in special education structured study, a "B+" in general education biology and an "A" in general education art.

In eighth grade, the District modified K.L.'s individualized educational program and provided 750 minutes per week of specially designed instruction in reading, writing, mathematics and study skills. K.L.'s accommodations basically stayed the same. Halfway through eighth grade, in January 2003, Mother contacted the District regarding K.L.'s frustrations with her language arts class. K.L. considered her language arts class "boring," "stupid" and "too hard." Specifically, K.L. did not like being singled out to give an answer in front of her classmates. In response, K.L.'s language arts teacher changed her teaching style, thereby galvanizing K.L. to increase her classroom participation and self-confidence.

K.L. took a standardized test of basic skills and scored in the second percentile of eighth graders. Although K.L. made progress on all of her eighth grade individualized educational program objectives, she failed to meet all writing objectives, two reading objectives, one mathematics objective and one study skills objective. At the end of eighth grade, K.L. received a "B" in special education language arts, a "B+" in special education mathematics, an "A" in special education structured study, an "A" in general education science, an "A" in general education social studies and a "pass" as a teacher's assistant.

The District reevaluated K.L. after eighth grade in June 2003. K.L.'s IQ showed improvement in mathematics and regression in numerical operations. One of K.L.'s teachers

observed that K.L. performed much better in class than her standardized test results showed. This was due to a combination of K.L.'s sporadic lack of motivation and propensity to get frustrated on tests and simply give up. K.L's individualized educational program team met shortly thereafter to discuss the District's reevaluation. A few days later, K.L.'s individualized educational program team met and developed a ninth grade individualized educational program with lofty objectives. Based on K.L.'s great progress in eighth grade mathematics, K.L. was placed in a ninth grade algebra class with a difficulty level between special education mathematics and general education algebra.

During first semester of ninth grade at Mercer Island High School, not only did K.L. earn good grades, such as an "A-" in algebra, but she also participated in athletics and enjoyed an active (and sometimes distractive) social life. Unfortunately, in March 2004, K.L. missed three weeks of school due to an illness. One of K.L.'s teachers believed that K.L. "was not the same student" after she returned and that she was less motivated. K.L. turned in only half of her algebra homework and her quiz and test grades decreased as a result. At K.L.'s request, her individualized educational program team returned her to special education mathematics and provided her with another resource room period. Parents hired a private educational consultant and began researching private schools for K.L.

At the end of ninth grade, K.L. received a "B-" in special education English foundations, an "A-" in special education mathematics, a "C+" in general education history, a "B" in general education chemistry and an "A" as a teacher's assistant. K.L.'s grade point average was a 3.49, which was higher than both the median and mean grade point average for ninth graders in the District. By the end of ninth grade, K.L. met all of her mathematics and study skills individualized educational program objectives, however, she did not meet two of her reading objectives and any of her writing objectives. Never-

theless, K.L.'s individualized educational program team thought that K.L. "had a very successful year, her grades have been high and though at times she is frustrated or afraid, she has managed to tackle the projects with support." Unbeknownst to anyone at the District, Mother completed much of K.L.'s ninth grade homework, sometimes even in K.L.'s absence.

Shortly after ninth grade concluded, in June 2004, the District held an individualized educational program meeting and presented a proposed tenth grade individualized educational program to Parents. The proposed program provided 972 minutes per week of specially designed instruction in reading, writing, mathematics, study skills and transitions. K.L.'s reading goal was to increase reading decoding and comprehension skills on grade-level materials. K.L.'s written language goal was to increase written expression skills in a more independent manner. The individualized educational program provided most of the same accommodations as K.L.'s ninth grade individualized educational program with the addition of access to books on tape. The individualized educational program's transition statement indicated that K.L.'s programming "is aimed at attending a community or technical college."[3] Parents told the District that they were displeased with K.L.'s ninth grade education and were "looking at other options." This was the first time that Parents had ever expressed dissatisfaction with K.L.'s education.

On the same day, Parents applied to Landmark School, a private residential school in Massachusetts exclusively for learning-disabled students.[4] In her part of the application, K.L.

---

[3]Plaintiffs assert that they were actually interested in four-year colleges; however, they admit that K.L. never communicated this aspiration to anyone at the District.

[4]On the application form, Parents indicated that they were negotiating with the District to fund Landmark School. In fact, Plaintiffs had not even disclosed their interest in Landmark School to the District at that point in time.

indicated that she did not like attending Mercer Island High School because "my resource room teacher does not let me relax" and "I don't like the pressure to be an A student." K.L. generally thought that her peers were "competitive academically" and that if a student did not receive a 4.0 grade point average, "you were the odd one out" and "didn't fit in."

The day after the individualized educational program meeting, the District emailed Parents to set up another individualized educational program meeting to address Parents' dissatisfaction with the proposed program. Parents received the District's email but chose not to respond. Sometime thereafter, Mother told K.L.'s case manager at the District that K.L.'s primary problem was with the teaching style utilized in English foundations. K.L.'s case manager asked Mother if K.L. would be more comfortable in a class with either a one-to-one or one-to-two teacher to student ratio, although K.L.'s case manager personally believed that this environment would be too restrictive. Mother declined this more reading intensive proposal.

Later in June 2004, Parents sent the District a letter requesting an independent educational evaluation at the District's expense to be performed by Dr. Deborah Hill. *See* 20 U.S.C. § 1415(b)(1)(A). Parents indicated that they disagreed with the District's June 2003 reevaluation primarily because of inappropriate recommendations for instructional strategies and special education services. The District first rejected Dr. Hill because she was not on the District's approved list of evaluators; however, the District approved Dr. Hill shortly thereafter.

A few days later, the District sent a letter to Parents seeking their consent for an independent educational evaluation to be conducted by Children's Hospital Regional Medical Center ("Children's Hospital"). *See* 20 U.S.C. § 1414(a)(2). Parents did not return the consent form.

Dr. Hill evaluated K.L. in early July 2004. Dr. Hill found that K.L. was generally average and had an IQ of 101. K.L. scored in the borderline or extremely low range in written comprehension and written language. Dr. Hill concluded that K.L.'s special education at the District had been inadequate because K.L. needed an intensive approach to remedy her disability. Ultimately, Dr. Hill determined, no public school in Washington could provide K.L. with an appropriate education. Dr. Hill recommended Landmark School because of its focus on improving phonological awareness skills.

In early August 2004, Parents informed the District that they were unilaterally enrolling K.L. in Landmark School for tenth grade. They requested tuition reimbursement from the District.

A few days later, the District sent Parents another consent form for Children's Hospital to evaluate K.L. Parents did not respond to the District before K.L. left to attend Landmark School in Massachusetts.

In late August, Parents denied consent to the independent educational evaluation proposed by the District. Parents indicated that they would only allow the District to review records, teacher reports and guidance team reviews. Parents refused to allow any communication between the doctors that would be examining K.L. and the District. Parents asserted that they could not provide knowledgeable consent until they received a written description of the evaluation procedures to be conducted, the purpose of any testing and each evaluation test, procedure, record or report used to formulate the District's proposal to evaluate. Parents stated that they wanted to make sure each evaluation was necessary and avoid duplicative tests. Parents put the District on notice that they had an attorney.

In early September 2004, the District sent Parents a third consent form. The District also scheduled an individualized

educational program meeting for mid-September, which was the earliest time the meeting could be scheduled due to the large number of participants. District staff held a "pre-meeting meeting" to develop an individualized educational program proposal and discuss the recommendations of Parents and Dr. Hill. At the actual individualized educational program meeting, the District presented a proposal with several changes that followed Dr. Hill's recommendations, including more intensive reading instruction. No representative from Landmark School attended this meeting. The individualized educational program provided for 1215 minutes per week of specially designed instruction in reading, writing, mathematics and study skills. The program included transition objectives such as exploring career options, meeting successful dyslexic adults, developing self-advocacy and increasing problem-solving skills. The individualized educational program provided the same accommodations as K.L.'s ninth grade program with the addition of spelling not counting against K.L.'s grades and the use of additional computer technology for spelling. The individualized educational program team rejected a Landmark School placement as inappropriate for K.L. for various reasons, most notably because the Landmark School curriculum did not target K.L.'s deficient areas and completely segregated her from her typically-developing peers. At the conclusion of the meeting, Parents informed the District that K.L. would not return to Mercer Island High School.

The District sent Parents a fourth independent educational evaluation consent form at the end of September. In early October, Parents finally consented. The independent educational evaluation took place in November when K.L. was home visiting her family on vacation. The independent educational evaluation reports from Children's Hospital overwhelmingly agreed with the District's proposed individualized educational program. The doctors agreed with the District that sixth to eighth grade was the appropriate instructional level for K.L and that K.L. demonstrated age-

appropriate phonological awareness skills. The doctors found that K.L. had made an average of at least one year's progress per year at the District. The doctors concluded that K.L. should be educated with her typically-developing peers as much as possible. One doctor even opined that there was no evidence demonstrating the effectiveness of Landmark School's teaching methodology.

After receiving the independent educational evaluation reports, the District conducted its own reevaluation and drafted a reevaluation report dated March 2005. The reevaluation report concluded that K.L. exhibited age-appropriate phonological awareness skills, scored in the low range of expressive language skills and spelled poorly. The report recommended keeping most of K.L.'s ninth grade individualized educational program, which meant keeping her in several general education classes because the District continued to believe that mainstreaming was appropriate for K.L.

The individualized educational program team convened later in March to discuss the District's proposed program for eleventh grade. No representatives from Landmark School attended but the team reviewed K.L.'s Landmark School progress reports. The proposed program incorporated many recommendations suggested by Dr. Hill and all made by Children's Hospital. The individualized educational program provided previous accommodations as well as access to teacher notes, not being called on without warning, extra time to respond to questions, no penalty for spelling errors and homework limited to three hours per night. The District expressly rejected Parents' request to include the Landmark School curriculum in the program. The District also declined to name a particular teaching methodology to be utilized by all teachers because its experts recommended several effective programs, not just a single "right" choice.[5]

---

[5]The parties' arguments throughout this litigation have routinely bordered on the quintessential "battle of the experts" concerning what educa-

On June 6, 2005, Plaintiffs filed a due process hearing request pursuant to 20 U.S.C. § 1415(f), seeking reimbursement for K.L.'s Landmark School tuition and expenses. The District attempted once more, in August 2005, to appease Parents. The District sent Parents a letter offering a program engineered by an expert in reading who works at Children's Hospital. Parents declined the District's offer.

K.L. completed tenth, eleventh and twelfth grades at Landmark School.[6] K.L.'s total expenses were $46,479.90 for tenth grade, $50,681.24 for eleventh grade and $54,838.54 for twelfth grade.

## II

The ALJ conducted the due process hearing over the course of eleven days in September and October 2005. The ALJ concluded that the District provided a free appropriate public education to K.L. as required by *Rowley* and denied tuition reimbursement. *See* 20 U.S.C. § 1412(a)(10)(C)(i) (stating that a school district is not responsible for private school reimbursement if it offered a free appropriate public education). Plaintiffs sought review from the United States District Court for the Western District of Washington. *See* 20 U.S.C. § 1415(i)(2)(A).

The district court reversed and remanded. After examining congressional findings added in the 1997 Individuals with Disabilities Education Act amendment and the definition of "transition services," the district court concluded that Congress sought to supersede the "educational benefit" standard set forth in *Rowley*. The district court's analysis yielded the

tional policy and teaching method is most effective for learning-disabled students. The District is entitled to deference in deciding what programming is appropriate as a matter of educational policy. *See Rowley*, 458 U.S. at 206.

[6]Plaintiffs moved out of the District prior to K.L.'s twelfth grade year.

following new free appropriate public education standard focused on transition services:

> [W]hether the District's approach to [the student's] educational challenges met the IDEA standard of "equality of opportunity, full participation, independent living, and economic self-sufficiency" for the minor and whether the programs developed for her conferred a "meaningful educational benefit" in light of the IDEA's goals.

*J.L. v. Mercer Island Sch. Dist.*, No. C06-494P, 2006 WL 3628033, at *6 (W.D. Wash. Dec. 8, 2006). The district court instructed the ALJ that under the new standard, K.L. did not receive a free appropriate public education in eighth, ninth and tenth grades. *See id.* at *4 ("Parents are correct that the failure of the IEPs to focus on progressing K.L. toward self-sufficiency (i.e., independent living) and her desired goal of post-secondary education represents a failure to confer the benefit contemplated by the IDEA."). The ALJ's only tasks on remand were to determine whether Landmark School was an appropriate placement and to fashion relief.

On remand, the ALJ concluded that K.L.'s placement at Landmark School was appropriate. The ALJ awarded reimbursement for tuition and related expenses for tenth and eleventh grades based on the district court's holding that K.L. did not receive a free appropriate public education in those grades. However, the ALJ equitably reduced tenth grade reimbursement by the cost of seven months of enrollment at Landmark School after finding that Parents unreasonably delayed the District's reevaluation of K.L. prior to her tenth grade year. *See JG v. Douglas County Sch. Dist.*, 552 F.3d 786, 795 (9th Cir. 2008) (discussing equitable reductions). The ALJ awarded reimbursement for twelfth grade as "compensatory education" based on the district court's holding that K.L. did not receive a free appropriate public education in eighth and ninth grades. *See Parents of Student W v. Puyallup Sch. Dist.,*

*No. 3*, 31 F.3d 1489, 1496 (9th Cir. 1994) (discussing compensatory education). Both parties sought district court review of the ALJ's second decision.

The district court mostly upheld the ALJ's decision. The district court did not impose the ALJ's equitable reduction. The district court ordered the District to pay for three years of Landmark School and $160,687.50 in attorneys' fees. This appeal followed.

## III

**[1]** "The IDEA provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures." *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1207 (9th Cir. 2008) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993)). The Individuals with Disabilities Education Act's primary goal is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services . . . ." *See* 20 U.S.C. § 1400(d)(1)(A). "[A] state must comply both procedurally and substantively with the IDEA." *Hellgate*, 541 F.3d at 1207 (quoting *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005)). "State standards that are not inconsistent with federal standards [under the IDEA] are also enforceable in federal court." *Id.* at 1208 (quoting *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1483 (9th Cir. 1992)).

States satisfy the Individuals with Disabilities Education Act's substantive requirements by providing a disabled child with a free appropriate public education. In 1975, Congress enacted the Education for All Handicapped Children Act, which contained the following definition of a "free appropriate public education":

> The term "free appropriate public education" means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 614(a)(5).

Pub. L. No. 94-142, § 4, 89 Stat. 773, 775 (1975) (codified as amended at 20 U.S.C. § 1401(8)(D)).

**[2]** In 1982, the Supreme Court rendered its seminal decision construing the Act and the scope of a free appropriate public education in *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982). The Court noted that "Congress was rather sketchy in establishing substantive requirements." *Id.* at 206. The Court concluded that states must provide a "basic floor of opportunity" to disabled students, not a "potential-maximizing education." *Id.* at 197 n.21, 200. "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." *Id.* at 192. Phrased another way, states must "confer some educational benefit upon the handicapped child." *Id.* at 200.

To assist courts in this labyrinth of experts, educational policy and charged emotions, the Court established a two-part test to determine whether a state has provided a free appropriate public education. *Id.* at 206-07. "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* (footnotes omitted). "If these requirements are met, the State has complied with the

obligations imposed by Congress and the courts can require no more." *Id.* at 207.

**[3]** Congress amended the Act in 1983. *See* Pub. L. No. 98-199, 97 Stat. 1357 (1983). Congress did not alter the definition of a free appropriate public education, *see id.* § 2, 97 Stat. at 1357, or indicate its disapproval with *Rowley*, *see generally* Pub. L. No. 98-199, 97 Stat. 1357. Congress introduced the concept of "transition services" by authorizing federal funding for states "to assist in the transitional process to postsecondary education, vocational training, competitive employment, continuing education, or adult services." *Id.* § 10, 97 Stat. at 1367. Congress did not require states to supply transition services. *See id.*

Congress amended the Act again in 1986. *See* Pub. L. No. 99-457, 100 Stat. 1145 (1986). Congress did not change the definition of a free appropriate public education, *see id.* § 672, 100 Stat. at 1146-47, or indicate disapproval with *Rowley*, *see generally* Pub. L. No. 99-457, 100 Stat. 1145. Congress slightly changed the law regarding transition services to "include[ ] supported employment" as an acceptable form of "competitive employment." *Id.* § 306, 100 Stat. at 1163.

Congress' next amendment came in 1990 when the Act's name was changed to the "Individuals with Disabilities Education Act." *See* Pub. L. No. 101-476, § 901(a)(1), 104 Stat. 1103, 1141-42 (1990). Congress again did not change the definition of a free appropriate public education, *see id.* § 101, 104 Stat. at 1103-05, or indicate disapproval with the *Rowley* free appropriate public education standard, *see generally* Pub. L. No. 101-476, 104 Stat. 1103. Congress made two substantial changes regarding transition services. First, Congress newly required individualized educational programs to contain "a statement of the needed transition services for students beginning no later than age 16 and annually thereafter (and, when determined appropriate for the individual, beginning at age 14 or younger) . . . ." *Id.* § 101(e)(1), 104 Stat. at 1104.

Second, Congress amended the definition of "transition services" to the following:

> The term "transition services" means a coordinated set of activities for a student, designed within an outcome-oriented process, which promotes movement from school to post-school activities, including postsecondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation. The coordinated set of activities shall be based upon the individual student's needs, taking into account the student's preferences and interests, and shall include instruction, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

*Id.* § 101(d), 104 Stat. at 1103-04.

Congress amended the Individuals with Disabilities Education Act in 1997, the effect of which is disputed in the present litigation.[7] *See* Pub. L. No. 105-17, 111 Stat. 37 (1997). Even though Congress added numerous new findings, *see id.* § 101, 111 Stat. at 38-42, Congress did not indicate disapproval with *Rowley*, *see generally* Pub. L. No. 105-17, 111 Stat. 37. Congress enacted the same definition of a free appropriate public education for all intents and purposes.[8] *See id.* § 602, 111 Stat.

---

[7] Congress amended the Individuals with Disabilities Education Act again in 2004. *See* Pub. L. No. 108-446, 118 Stat. 2647 (2004) (codified at 20 U.S.C. §§ 1400-1491). Plaintiffs' claims are governed by the 1997 Individuals with Disabilities Education Act because they filed their due process hearing request before the 2004 Act's effective date of July 1, 2005.

[8] Congress merely changed "which" to "that," replaced commas with semi-colons and updated the internal section reference. *See id.* § 602, 111 Stat. at 44.

at 44. Congress newly required, "beginning at age 14, and updated annually, a statement of the transition service needs of the child . . . that focuses on the child's courses of study (such as participation in advanced-placement courses or a vocational education program)." *Id.* § 614(d)(1)(A)(vii)(I), 111 Stat. at 84.

## IV

"We review the district court's findings of fact for clear error, even when the district court based those findings on an administrative record." *Douglas County*, 552 F.3d at 793. "A finding of fact is clearly erroneous when the evidence in the record supports the finding but the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Hellgate*, 541 F.3d at 1207 (internal quotation marks omitted). "Questions of law and mixed questions of fact and law are reviewed de novo, unless the mixed question is primarily factual." *Id.*

"In IDEA cases, unlike other cases reviewing administrative action, we do not employ a highly deferential standard of review. Nevertheless, complete *de novo* review 'is inappropriate.' We give 'due weight' to the state administrative proceedings." *Douglas County*, 552 F.3d at 793 (citations omitted). "We give particular deference to 'thorough and careful' administrative findings." *Id.*

## V

The District argues that the district court erred in concluding that Congress sought to supersede *Rowley* or otherwise change the free appropriate public education standard. To support its newly-extrapolated free appropriate public education standard requiring transition services targeted at "equality of opportunity, full participation, independent living, and economic self-sufficiency," the district court relied on three new

congressional findings and the definition of "transition services."

We first examine the district court's reliance on Congress' definition of "transition services," originally added in the 1990 Individuals with Disabilities Education Act amendment. The district court stated:

> The IDEA is not simply about "access;" it is focused on "transition services, . . . an *outcome-oriented* process, which promotes movement from school to post-school activities . . . taking into account the student's preferences and interests." This is such a significant departure from the previous legislative scheme that any citation to pre-1997 case law on special education is suspect.

*Mercer Island*, 2006 WL 3628033, at *4 (citations omitted). The District argues that the district court failed to appreciate that the Education for All Handicapped Children Act was amended in 1990. The District suggests that this explains the district court's omission of any discussion of the nexus between the 1990 amendment, 1997 amendment and the district court's newfound standard.

Although the district court's order is ambiguous, the District is likely correct based on two of the district court's remarks. First, the district court stated that "[i]t is important to note that the law regarding 'disability education' underwent a change *about ten years ago*. Prior to that time, the statutory scheme was the Education for [sic] Handicapped Children Act of 1975 (EHA) . . . ." *Mercer Island*, 2006 WL 3628033, at *4 (emphasis added). Of course, the Education for All Handicapped Children Act ceased to exist *in 1990* when it was replaced by the Individuals with Disabilities Education Act, which was not "about ten years ago." *See* Pub. L. No. 101-476, § 101(d), 104 Stat. 1103, 1103-04 (1990). The district court simply appears to have been unaware of the 1990

amendment. This explains the district court's reliance on what it thought was a *new* definition of "transition services" in 1997, i.e., "about ten years" before the district court's 2006 order. The second remark demonstrating that the district court was not cognizant of the 1990 amendment was its footnote indicating "[a] 1995 (pre-IDEA) case." *Mercer Island*, 2006 WL 3628033, at *5. This footnote clearly shows that the district court did not realize that the Individuals with Disabilities Education Act existed before 1997.

However, because of the equivocal nature of the district court's order, it is also possible that the district court thought the Individuals with Disabilities Education Act "evolved" over time to eventually supercede *Rowley* in 1997. Neither Plaintiffs nor the district court have pointed to authority supporting the proposition that we should consider the legislative "evolution" of a statute when determining Congress' intent. Plain meaning interpretation is a "cardinal canon" of statutory construction, and evolutionary arguments are by no means plain. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); *Rubin v. United States*, 449 U.S. 424, 430 (1981) ("When we find the terms of a statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances." (internal quotation marks omitted)). Additionally, for legislation enacted pursuant to the Spending Clause, U.S. Const. art. I, § 8, cl. 1, such as the Individuals with Disabilities Education Act, it would seem that "evolutionary" theories by their very nature are foreclosed by the Supreme Court. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (requiring Congress to set out federal funding conditions "unambiguously" so that states can accept the funding "voluntarily and knowingly").

[4] Regardless of the district court's reasoning, we agree with the Court of Appeals for the First Circuit that there is no plausible way to read the definition of "transition services" as changing the free appropriate public education standard:

> We do not interpret this statutory language, which simply articulates the importance of teacher training, as overruling *Rowley*. This court has continued to apply the *Rowley* standard in cases following the 1997 amendments, as have several [other] circuits. And that is for good reason. The *Rowley* standard recognizes that courts are ill-equipped to second-guess reasonable choices that school districts have made among appropriate instructional methods.

*Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004).

In addition to the "transition services" definition, the district court also relied on three new congressional findings to support its conclusion that the 1997 amendment dramatically changed the free appropriate public education standard. First, Congress found that "[s]ince the enactment and implementation of the Education for All Handicapped Children Act of 1975, this Act has been successful in ensuring children with disabilities and the families of such children access to a free appropriate public education and in improving educational results for children with disabilities." Pub. L. No. 105-17, § 101(c)(3), 111 Stat. 37, 39 (1997). Second, Congress found that "the implementation of this Act has been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities." *Id.* § 101(c)(4), 111 Stat. at 39. Third, Congress found that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." *Id.* § 101(c)(1), 111 Stat. at 38.

**[5]** We conclude that the district court misinterpreted Congress' intent. Had Congress sought to change the free appropriate public education "educational benefit" standard—a standard that courts have followed vis-à-vis *Rowley* since

1982—it would have expressed a clear intent to do so. Instead, three omissions suggest that Congress intended to keep *Rowley* intact. First, Congress did not change the definition of a free appropriate public education in any material respect. If Congress desired to change the free appropriate public education standard, the most logical way to do so would have been to amend the free appropriate public education definition itself. Second, Congress did not indicate in its definition of "transition services," or elsewhere, that a disabled student could not receive a free appropriate public education absent the attainment of transition goals. Third, Congress did not express disagreement with the "educational benefit" standard or indicate that it sought to supersede *Rowley*. In fact, Congress did not even mention *Rowley*.

**[6]** In re-enacting the free appropriate public education definition in 1997, as Congress had done in the Act's three prior amendments, Congress presumably was aware of *Rowley* and its renowned "educational benefit" free appropriate public education standard. *See Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2492 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." (internal quotation marks omitted)). These vague legislative findings cited by the district court are insufficient for us to conclude that Congress sought to supersede the ubiquitous free appropriate public education standard set forth in *Rowley*. *See Branch v. Smith*, 538 U.S. 254, 273 (2003) (stating that "absent a clearly expressed congressional intention, repeals by implication are not favored" (citations and internal quotation marks omitted)).

**[7]** We hold that the district court erred in declaring *Rowley* superseded.[9] The proper standard to determine whether a dis-

---

[9]We need not separately address the district court's analysis concerning whether the District appropriately mainstreamed K.L. and provided her with accommodations. The district court's analysis was clearly infected by its interpretation of the 1997 Individuals with Disabilities Education Act amendment. On remand, the district court may revisit these issues in light of *Rowley* and its progeny.

abled child has received a free appropriate public education is the "educational benefit" standard set forth by the Supreme Court in *Rowley*.[10] Our holding is necessary to avoid the conclusion that Congress abrogated *sub silentio* the Supreme Court's decision in *Rowley*. *Cf. Forest Grove*, 129 S. Ct. at 2493-94. On remand, the district court must review in the first instance the ALJ's determination that the District provided a free appropriate public education as required by *Rowley*.

## VI

Although we remand to the district court the issue of substantive compliance with the Individuals with Disabilities Education Act so that the court can consider the matter in the first instance, we need not remand the procedural compliance issues because the district court's analysis did not turn on any disputed legal standards. The district court held that the District failed to confer a free appropriate public education based on procedural violations involving transition services, the District's "pre-meeting meeting," lack of a specified teaching methodology and lack of specified minutes of instruction. We discuss each contention in turn.

[8] The District argues that Plaintiffs failed to exhaust their claim that the District committed a procedural violation of the Individuals with Disabilities Education Act in regards to transition services. "[W]hen a plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies, exhaustion of those remedies is

---

[10]Some confusion exists in this circuit regarding whether the Individuals with Disabilities Education Act requires school districts to provide disabled students with "educational benefit," "some educational benefit" or a "meaningful" educational benefit. *See, e.g., Hellgate*, 541 F.3d at 1212-13. As we read the Supreme Court's decision in *Rowley*, all three phrases refer to the same standard. School districts must, to "make such access meaningful," confer at least "some educational benefit" on disabled students. *See Rowley*, 458 U.S. at 192, 200. For ease of discussion, we refer to this standard as the "educational benefit" standard.

required." *Robb v. Bethel Sch. Dist. # 403*, 308 F.3d 1047, 1048 (9th Cir. 2002); *see also* 20 U.S.C. § 1415(i)(2)(A). Plaintiffs did not raise a transition services argument in their administrative complaint or due process hearing. For this reason, the ALJ did not address transition services. Nevertheless, the district court held that K.L. was denied a free appropriate public education based on the District's failure to supply appropriate transition services. We hold that the district court lacked subject matter jurisdiction to consider this unexhausted claim, and reverse the district court.

**[9]** The District next argues that the district court erred in concluding that it predetermined K.L.'s individualized educational program at the "pre-meeting meeting" in September 2004. There is no evidence supporting the district court's finding that the District made program decisions at this preparatory meeting. *See* 34 C.F.R. 300.501(b)(3) (stating that an individualized educational program meeting "does not include preparatory activities that public agency personnel engage in to develop a proposal or response to a parent proposal that will be discussed at a later meeting"). Not only did Parents actively participate in the individualized educational program formulation process, the District changed various aspects of the program based on the recommendations of Parents and Dr. Hill. *See Target Range*, 960 F.2d at 1484. We hold that the District did not commit a procedural violation of the Individuals with Disabilities Education Act in its "pre-meeting meeting," and reverse the district court.

**[10]** The District next argues that the district court erred in concluding that the District committed a procedural violation of the Individuals with Disabilities Education Act by not specifying a teaching methodology in K.L.'s individualized educational program. Although school districts should specify a teaching methodology for some students, for other students "IEPs may not need to address the instructional method to be used because specificity about methodology is not necessary to enable those students to receive an appropriate education."

*See* 64 Fed. Reg. 12,552. We accord deference to the District's determination and the ALJ's finding that K.L.'s teachers needed flexibility in teaching methodologies because there was not a single methodology that would always be effective. We hold that the District did not commit a procedural violation of the Individuals with Disabilities Education Act by not specifying teaching methodologies in K.L.'s individualized educational programs, and reverse the district court.

**[11]** In a similar vein, the District argues that the district court erred in concluding that the District committed a procedural violation by not specifying the minutes of instruction to be devoted to each of K.L.'s services in her individualized educational programs. An individualized educational program is a "formal, written offer [that] creates a clear record that will do much to eliminate troublesome factual disputes." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994). In an individualized educational program, a school district must specify "the anticipated frequency, location, and duration of [special education] services." 20 U.S.C. § 1414(d)(1)(A)(vi) (1998). "The amount of time to be committed to each of the various services to be provided must be (1) appropriate to the specific service, and (2) stated in a manner that is clear to all who are involved." 64 Fed. Reg. 12,479.

K.L.'s individualized educational program lists her supplementary aids, services and program modifications. These modifications consist of many access-based accommodations, such as access to books on tape, access to a peer note taker and word processing software, extended time for tests and assignments, alternative exam methods, preferential seating and scheduling, and use of a calculator and literacy software. Her 2005 individualized educational program states that she would have access to these accommodations for 972 minutes per week. While a lump-sum number like this may not be appropriate in other individualized educational programs, we find it to be sufficient in this case. Here, the allocation of a specific number of minutes to any of the above accommoda-

tions would make no sense because they are all access-based modifications. Presumably, K.L. had unlimited access to each of the above accommodations. Because the individualized educational program is written before the provision of any services, it is not reasonable to expect the school district to predict the amount of time the student will actually use the accommodations to which she has been given access. Here, K.L.'s individualized educational program still functions as a "clear record that will do much to eliminate troublesome factual disputes" because it still lists K.L.'s accommodations and suggests that they should be available to her on demand. *Smith*, 15 F.3d at 1526. Under the circumstances of this case, we conclude that the amount of time to be devoted to K.L's services was appropriate to the specific services provided.

Even if the District did commit a procedural violation by failing to specify minutes, not every procedural violation results in the denial of a free appropriate public education. A procedural violation denies a free appropriate public education if it results in the loss of an educational opportunity, seriously infringes the parents' opportunity to participate in the IEP formulation process or causes a deprivation of educational benefits. *Hellgate*, 541 F.3d at 1208 (quoting *Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001)). Here, Plaintiffs fail to show how K.L. was prejudiced by the District's failure to specify the amount of services she was to receive. They do not allege that she was denied an educational benefit or missed an educational opportunity. Nor do they show that the parents' ability to participate in the individualized educational program formulation process was harmed. Indeed, the record suggests that even though the individualized educational program did not list the amount of services, everyone involved in the individualized educational team— including K.L.'s parents—knew of the amounts.

We hold that the District did not violate the Individuals with Disabilities Education Act by failing to specifying minutes of instruction in K.L.'s individualized educational pro-

gram. We further hold that any procedural violation that may have occurred did not deny K.L. a free appropriate public education, and reverse the district court.

## VII

For the reasons discussed, we conclude that the district court erred in holding that the definition of a free appropriate public education set forth by the Supreme Court in *Rowley* has been superseded, and accordingly, vacate its orders.[11] In addition, we reverse the district court's conclusions that the District committed procedural violations of the Individuals with Disabilities Education Act that resulted in the denial of a free appropriate public education.

Because it is not clear whether our rulings dispose of all of K.L.'s claims, we remand this case to allow K.L. to pursue any such claims she may have asserted that are not determined by our opinion. On remand, the district court must review the ALJ's determination that the District provided K.L. with a free appropriate public education pursuant to the "educational benefit" standard set forth in *Rowley* and reiterated in this opinion. We deny the District's request for a different judge on remand.

**REVERSED in part, VACATED in part and REMANDED.**

---

[11]Because the district court's awards of reimbursement, related expenses and attorneys' fees were premised on its determination that the District failed to provide K.L. with a free appropriate public education, vacation of that determination also vacates those awards.