NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



| | |
|---|---|
| R. E. B., individually and on behalf of his minor child, J.B., <br><br>        Plaintiff-Appellant, <br><br> v. <br><br> STATE OF HAWAII DEPARTMENT OF EDUCATION and KATHRYN MATAYOSHI, in her official capacity as Superintendent of the Hawaii Public Schools, <br><br>        Defendants-Appellees. | No.   14-15895 <br><br> D.C. No. 1:13-cv-00016-DKW-BMK <br><br><br> MEMORANDUM* |

Appeal from the United States District Court
for the District of Hawaii
Derrick Kahala Watson, District Judge, Presiding

Argued February 23, 2017; Submitted April 3, 2018
Honolulu, Hawaii

Before:  HAWKINS, BEA, and NGUYEN, Circuit Judges.

---

* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

This case concerns J.B.'s transition from Pacific Autism Center ("PAC"), a small private school for students with autism and other special needs, into a Hawaii public school named Koko Head Elementary School ("Koko Head"). During that time, Hawaii Department of Education ("DOE") personnel convened to develop an Individualized Education Plan ("IEP") for J.B.'s transition. J.B.'s father, R.E.B., raised various objections to J.B.'s proposed IEP, but the administrative hearings officer found that his IEP was adequate. The district court affirmed. R.E.B. then appealed to this court. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

1. As a threshold matter, DOE claims this case is moot because J.B. received relief beyond that originally requested. But a case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). While R.E.B. initially sought reimbursement of PAC tuition for the 2012–2013 school year, which DOE provided, his due process complaint also sought reimbursement for transportation and compensatory education, which he never received. Because it is still possible for us to grant effectual relief, this case is not moot.

2. Next, R.E.B. contends that DOE violated the Individuals with Disabilities Education Act ("IDEA") because it denied J.B. a free appropriate public education

2

("FAPE"). We review the district court's factual findings for clear error and its legal conclusions, including whether an IEP provides a FAPE, de novo. *Doug C. v. Haw. Dep't of Educ.*, 720 F.3d 1038, 1042 (9th Cir. 2012).

"A FAPE must be 'tailored to the unique needs of the handicapped child by means of an [IEP].'" *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017) (quoting *Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 181 (1982)). To constitute a denial of a FAPE, procedural errors must "result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process." *Doug C.*, 720 F.3d at 1043 (quoting *Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 317 F.3d 1072, 1078 (9th Cir. 2003), *superseded on other grounds by* 20 U.S.C. § 1414(d)(1)(B)). Substantively, the court must determine whether the IEP was "reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks omitted). To satisfy the "educational benefit" requirement, DOE must "provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1057 (9th Cir. 2012) (quoting *Rowley*, 458 U.S. at 203).

R.E.B. first argues that DOE violated the IDEA by failing to address his concerns about J.B.'s transition from PAC to Koko Head. Particularly, R.E.B.

complains that J.B.'s IEP did not specify where J.B.'s summer 2012 Extended School Year ("ESY") services would take place when J.B. was transitioning from PAC to Koko Head.

DOE sufficiently addressed R.E.B.'s concerns about J.B.'s transition services. Although J.B.'s IEP did not specify where J.B.'s summer 2012 ESY services would take place, his IEP listed his current school as Koko Head. Additionally, the IDEA does not require that an IEP list the specific school where summer transition services will take place. *See* 20 U.S.C. § 1414(d)(1)(A).

Further, while R.E.B. and DOE worked together to develop J.B.'s IEP, DOE listened to R.E.B.'s concerns about J.B.'s transition and tried to address them at a "transfer plan meeting" held on June 13, 2012. Koko Head's principal stated that the meeting's purpose was "to consider [J.B.'s] possible needs to minimize potential harmful effects in the transfer from PAC to a DOE public school campus." The school district decided at that meeting that, to ease J.B.'s transition, J.B. would gradually transition during the summer from PAC to public school and would not be "mainstreamed" (educated in a general education setting with nondisabled peers) during this summer transition. DOE decided that this gradual transition would help avoid anxiety that could overwhelm J.B. Thus, DOE responded to R.E.B.'s concerns about J.B.'s transition and made a plan to facilitate

4

that transition that would help J.B. adapt to his new school.  Therefore, DOE did not violate the IDEA by failing to address R.E.B's concerns.

3.  R.E.B. also contends that DOE violated the IDEA because J.B.'s IEP did not specify the Least Restrictive Environment ("LRE") for J.B.  The IDEA states that children with disabilities should be placed in the LRE:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).  Regulations interpreting the IDEA state that the IEP must include "[a]n explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class."  34 C.F.R. § 300.320(a)(5).

J.B.'s IEP states that J.B.

> will not participate with non-disabled peers for Reading, Writing, Math, Science, Social Studies, Speech/Language Therapy and Occupational Therapy. [J.B.] will participate with non-disabled peers for Library, Music, PE, Art, Computer, Hawaiian Studies, Mandarin, recesses, lunch, field trips, assemblies and school-wide activities. [J.B.] will also receive specialized instruction in the general education setting for Science and Social Studies activities as deemed appropriate by his Special Education teacher/Care Coordinator and General Education teacher.

5

This explanation sufficiently specifies the LRE for J.B. under the IDEA because J.B.'s IEP team (which included J.B.'s public school principal, future teachers, and R.E.B.) decided for all academic subjects, as a general matter, whether J.B. would participate with nondisabled peers. The IEP then delegated to J.B.'s teachers the decision to have J.B. participate with nondisabled peers for certain "Science and Social Studies activities" even though, as a general matter, J.B. would not participate with nondisabled peers for these subjects. This nuanced determination was reasonable because, as part of the Science and Social Studies curriculums, elementary school students often perform experiments, simulations, and field trips—the activities to which the IEP alluded. Given J.B.'s autism, it was reasonable for the IEP team to conclude that he would be able to participate successfully with nondisabled peers for some of these activities, but not for others, and that those activities that would be proper for J.B. could not be determined at an IEP meeting months or years before those activities happened. Therefore, it was reasonable for J.B.'s IEP to specify that J.B.'s "Special Education teacher/Care Coordinator and General Education teacher" would decide together which particular activities J.B. would participate in with nondisabled peers with the benefit of specialized instruction. Particularly in light of the fact that the IDEA

6

provides that the LRE should be specified "[t]o the maximum extent appropriate," 20 U.S.C. § 1412(a)(5)(A), J.B.'s IEP satisfied the IDEA's LRE requirement.[1]

4. R.E.B. contends that the IDEA required DOE to specify in J.B.'s IEP that his one-on-one aide would have the same qualifications as a contracted skills worker. But "nothing in [20 U.S.C. § 1414(d)] indicates that an IEP must specify the qualifications or training of service providers." *S.M. v. Haw. Dep't of Educ.*, 808 F. Supp. 2d 1269, 1274 (D. Haw. 2011); *see also* 20 U.S.C. § 1414(d)(1)(A)(i)(IV) (requiring only that an IEP include a statement of the "supplementary aids and services . . . to be provided to the child"); HAW. CODE R. § 8-60-44(a)(4) (same). Nor does the record establish that DOE even agreed to provide an aide with such qualifications at the IEP meeting.

---

[1]     DOE also sufficiently considered the *Rachel H.* balancing factors, which school districts use to assess whether a child should be educated with nondisabled peers or with other disabled peers. *See Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. ex rel. Holland*, 14 F.3d 1398, 1404 (9th Cir. 1994). These factors include "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [the child has] on the teacher and children in the regular class; and (4) the costs of mainstreaming [the student]." *Id.*

As the district court concluded, the IEP team "engaged in a thorough analysis that incorporated all four of the *Rachel H.* factors." Notes from, and an audio recording of, the May 7, 2012, IEP meeting confirm that the district court was right. The IEP team discussed the *Rachel H.* factors for nearly an hour at an IEP meeting. During this time, the members of the IEP team completed a worksheet that helped the team understand how the different *Rachel H.* factors cut in favor of educating J.B. with nondisabled peers or with other disabled peers.

5.  Finally, R.E.B. contends that DOE violated the IDEA by not specifying the use of Applied Behavioral Analysis ("ABA") methodology in J.B.'s IEP.  At PAC, J.B.'s teachers used ABA, a teaching methodology for students with autism.  R.E.B. wanted DOE to specify in J.B.'s IEP that ABA methodology would be used with J.B.  At an IEP meeting on May 9, 2012, J.B.'s father directly stated that he expressed a strong preference for "pure VB-MAPP," a particular type of ABA methodology.  However, at that meeting, J.B.'s future teachers stated that they thought it was best to use multiple methodologies with J.B.  A special education teacher stated that she would "work[] off the data submitted by PAC," and then described a number of methodologies she would use with J.B., including "natural environment training," "things they use in [occupational therapy] and speech [therapy]," and "[various] reinforcers and motivators."  The principal and the teachers explained that they did not want to specify ABA methodology in the IEP because the teachers wanted to use more than one methodology.  As a result, J.B.'s IEP did not specify any particular methodology.

DOE was not required to specify ABA methodology in J.B.'s IEP.  While we recognized in *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 952 (9th Cir. 2009), that "school districts should specify a teaching methodology for some students" in their IEPs, we did not provide much guidance beyond stating that doing so is necessary for some students.  The facts of *J.L.*, however, suggest that

8

DOE was not required to specify ABA methodology in J.B.'s IEP. In *J.L.*, "[t]he District . . . declined to name a particular teaching methodology to be utilized by all teachers because its experts recommended several effective programs, not just a single 'right' choice." *Id.* at 945. After the district court held that the school district committed a procedural violation of the IDEA in so doing, we reversed. *Id.* at 952, 954. As we explained:

> We accord deference to the District's determination and the ALJ's finding that [the student's] teachers needed flexibility in teaching methodologies because there was not a single methodology that would always be effective. We hold that the District did not commit a procedural violation of the Individuals with Disabilities Education Act by not specifying teaching methodologies in [the student's] individualized educational programs[.]"

*Id.* at 952. This case is similar. J.B.'s teachers thought it was best to use multiple teaching methodologies with J.B. They wanted the flexibility to select the methodology that best fit J.B.'s needs as they arose. Given this precedent and the deference we owe to J.B.'s teachers who thought it was best to use multiple teaching methodologies, we hold it was not necessary for J.B.'s IEP to specify that the ABA methodology would be used. Therefore, DOE did not deny J.B. a FAPE and did not violate the IDEA.

**AFFIRMED.**

9